**Chan KENDRICK, Reverend Robert E. Vaughn, Reverend Lawrence W. Buxton, Dr. Emmett W. Cocke, Jr., Shirley Pedler, Reverend Homer A. Goddard, Joyce Armstrong, John Roberts and the American Jewish Congress, Plaintiffs,**

v.

**Dr. Otis R. BOWEN, Jr., Secretary of the Department of Health and Human Services, Defendant,**

**and**

**Sammie J. Bradley, Katherine K. Warner and United Families of America, Defendant-Intervenors.**

**Civ. A. No. 83–3175.**

United States District Court, District of Columbia.

April 15, 1987.

As Modified May 15, 1987.

See also, 778 F.2d 253.

Janet Benshoof, Nan D. Hunter, Lynn M. Paltrow, Suzanne M. Lynn and Verna C. Sanchez, American Civil Liberties Union, New York City, and Bruce J. Ennis, Washington, D.C., for plaintiffs.

Theodore C. Hirt, Thomas Millet, Charles Sorenson and Jeffrey Paulson, Dept. of Justice, Richard K. Willard, Acting Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., Brook Hedge, Branch Director, Lewis K. Wise, Asst. Branch Director, Dept. of Health and Human Services, Joel Mangel, Deputy Asst. Gen. Counsel for Public Health, Carol Conrad, Sr.Atty. and Susan K. Ruby, Public Health Service, Washington, D.C., for defendant.

Edward R. Grant, Chicago, Ill., and Paul Arneson, Washington, D.C., for defendant-intervenors.

Wilfred R. Caron, Gen. Counsel, and Mark E. Chopko, Asst. Gen. Counsel, Washington, D.C., for amicus curiae U.S. Catholic Conference.

Patricia Hennessey, New York City and David B. Hopkins, Washington, D.C., for the amici curiae United Church of Christ Board of Homeland Ministries, Catholics for a Free Choice, Unitarian Universalist Ass'n, Union of American Hebrew Congregations and American Ethical Union.

Mari Anne T. Hamilton, Silver Spring, Md., Edward R. Grant, Maura K. Quinlan and Thomas Balch, Americans United for Life Legal Defense Fund, Chicago, Ill., for amicus curiae Americans United for Life.

## TABLE OF CONTENTS

Page

I. INTRODUCTION ............................................................ 1551

II. BACKGROUND ............................................................ 1552

III. BECAUSE THE MATERIAL FACTS ARE NOT IN DISPUTE, SUMMARY JUDGMENT IS APPROPRIATE IN THIS CASE. ............................................................ 1553

IV. THE FEDERAL TAXPAYER PLAINTIFFS HAVE STANDING TO BRING THIS ACTION BECAUSE THEY RAISE AN ESTABLISHMENT CLAUSE CHALLENGE TO THE

## TABLE OF CONTENTS

Page

AFLA, WHICH WAS ENACTED PURSUANT TO THE TAXING AND SPENDING CLAUSE. 1554

V. BECAUSE THE AFLA DOES NOT MAKE EXPLICIT AND DELIBERATE DISTINCTIONS AMONG RELIGIONS, THE COURT MUST USE THE TRIPARTITE TEST SET FORTH IN LEMON V. KURTZMAN TO EVALUATE THE STATUTE. 1556

VI. ALTHOUGH THE AFLA HAS A VALID SECULAR PURPOSE, IT IS UNCONSTITUTIONAL ON ITS FACE BECAUSE IT HAS THE PRIMARY EFFECT OF ADVANCING RELIGION AND FOSTERS AN EXCESSIVE ENTANGLEMENT BETWEEN GOVERNMENT AND RELIGION, AND IT IS UNCONSTITUTIONAL AS APPLIED BECAUSE IT HAS THE PRIMARY EFFECT OF ADVANCING RELIGION. 1557

 A. The AFLA Has a Valid Secular Purpose of Combating Teenage Pregnancy and Associated Ills. 1558

 B. On Its Face and As Applied, the AFLA Has the Primary Effect of Advancing Religion Because of Its Use of Religious Organizations for Education and Counseling of Teenagers on Matters Relating to Religious Doctrine. 1560

 1. The legal standard of primary effect 1560

 2. On its Face, the AFLA has the primary effect of advancing religion because it funds teaching and counseling of adolescents by religious organizations on matters related to religious doctrine. 1562

 3. As applied, the AFLA has the primary effect of advancing religion. 1564

 C. Because Organizations Funded by the AFLA Have a Religious Character and Purpose, and the AFLA Programs Concentrate on Counseling and Education, the Degree of Government Monitoring Necessary to Prevent Grantees From Advancing Religion Would Necessarily Rise to the Level of Excessive Entanglement. 1567

 D. Because the AFLA Funds Religious Organizations to Provide Services Intrinsically Related to Fundamental Beliefs Upon Which Religions and Politicians Strongly Disagree, the AFLA Is Likely to Incite Political Division. 1569

VII. CONCLUSION 1569

CHARLES R. RICHEY, District Judge.

## I. INTRODUCTION

The plaintiffs challenge the constitutionality of the Adolescent Family Life Act ("AFLA"), 42 U.S.C. §§ 300z—300z-10 (1981), on the ground that on its face and as applied the statute violates the Establishment Clause of the First Amendment.[1] The fundamental question in this case is the constitutionality of a statute that allows religious organizations to use government funds for, *inter alia,* the counseling and teaching of adolescents on matters related to premarital sexual relations and teenage pregnancy. Although the Court finds that the AFLA has a valid secular purpose, it also finds that the AFLA, on its face, has the primary effect of advancing religion and fosters an excessive entanglement between government and religion. Moreover, the undisputed facts show that AFLA grants awarded to religious organizations have the primary effect of advancing religion. Therefore, the Court must hold that the AFLA is unconstitutional both on its face and as applied.[2] Accord-

---

**1.** The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend. I.

**2.** *Notwithstanding anything to the contrary herein, and with knowledge of plaintiffs' vigorous arguments in favor of a declaration that the*

*entire AFLA is unconstitutional, the Court today only decides that the AFLA is unconstitutional insofar as it involves religious organizations in carrying out the purposes of the Act and declares that the involvement of religious organizations as AFLA grantees or subgrantees is unconstitutional. The Court specifically reserves judgment as to whether the plaintiffs are correct in arguing*

ingly, the Court will grant plaintiffs' motion for summary judgment and will deny defendant's and defendant-intervenors' cross-motions for summary judgment by Order of even date herewith.

The Court is sensitive to the fact that its Opinion discusses particular beliefs and also discusses practices in which particular religious organizations have engaged. The Court intends nothing in this Opinion to reflect adversely on any religion. The Court notes that it is apparent from the party plaintiffs, defendant, and defendant-intervenors in this case that members of the same religious groups do disagree about the validity of the AFLA and hold differing, religiously based, beliefs about the program's goals. The Court also notes that this division obtains among Protestants, Catholics, Jews and others, and wishes to be quite clear that it discusses particular religions only insofar as is absolutely necessary for this Opinion.

■ No judge enjoys deciding a constitutional challenge to a United States statute. Because federal laws are enacted by Congress and approved by the Chief Executive, courts rightly employ a variety of doctrines in order to avoid overruling our co-equal branches of government. In deference to the considered judgments of the other branches, a court must strive, if possible, to avoid the constitutional issue altogether. *See Pennsylvania v. Ritchie,* —— U.S. ——, 107 S.Ct. 989, 1011, 94 L.Ed.2d 40 (1987) (Stevens, J., dissenting). As this case raises only constitutional issues, however, the Court does not have that option.

■ A second principle of judicial abstention is that a Court must avoid, if possible, finding that a statute does not conform to the requirements of the Constitution. *See Rescue Army v. Municipal Court of Los Angeles,* 331 U.S. 549, 568, 67 S.Ct. 1409, 1419, 91 L.Ed.2d 1666 (1947). Equally fundamental, if compelled to find a statute unconstitutional, a Court's decision should be so circumscribed as to wreak the least havoc on the law. As such, courts ought not leap to declare a statute invalid where they can merely proscribe a practice

under that law. *See Erznoznik v. Jacksonville,* 422 U.S. 205, 215–16, 95 S.Ct. 2268, 2275–76, 45 L.Ed.2d 125 (1975); *Rescue Army,* 331 U.S. at 569, 67 S.Ct. at 1419. But, after careful study, the Court has concluded that these principles, which the Court wholeheartedly accepts, are somewhat at odds with Establishment Clause case law.

While little else is clear in Establishment Clause case law, it is obvious that the distinction between a challenge to a statute on its face and as applied has not been clearly delineated. The precedents take as their form of analysis a consideration of the *possible* applications of a particular statute, *see, e.g., Committee for Public Education and Religious Liberty v. Nyquist,* 413 U.S. 756, 779–83, 93 S.Ct. 2955, 2968–70, 37 L.Ed.2d 948 (1973), then analyze the statute's actual application, *see, e.g., id.; Levitt v. Committee for Public Education and Religious Liberty,* 413 U.S. 472, 479–82, 93 S.Ct. 2814, 2818–20, 37 L.Ed.2d 736 (1973), and finally, even if the application is the only constitutionally offensive element to which the court has pointed, strike down the statute on its face. *See, e.g., Wolman v. Walter,* 433 U.S. 229, 255, 97 S.Ct. 2593, 2609, 53 L.Ed.2d 714 (1977); *Roemer v. Board of Public Works,* 426 U.S. 736, 767, 96 S.Ct. 2337, 2354, 49 L.Ed.2d 179 (1976).

This method of analysis, so different from that usually employed when considering constitutional claims, leaves this Court only one alternative if it is to abide by the teachings of the Supreme Court, which trial judges must. Accordingly, even though the Court does not relish the task, it has no alternative but to consider the statute *both* on its face and as applied. In the end, however, this double duty matters little because the AFLA is unconstitutional both on its face and as applied.

## II. BACKGROUND

The AFLA is a Congressional response to the severe and manifold problems resulting from teenage pregnancy and associated problems. *See* 42 U.S.C. § 300z(a). The

*that the constitutionally infirm language is not severable, pending further briefing in view of*

*Alaska Airlines v. Brock,* —— U.S. ——, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987).

Act was designed to prevent adolescent pregnancy by promoting self-discipline, and to mitigate or eviscerate the severe economic, social and health problems that often result from premarital sexual relations and teenage pregnancy. *See* 42 U.S.C. § 300z(b).

While the AFLA has three general program categories—care, prevention and research, *see* 42 U.S.C. §§ 300z–2 & 300z–7, the plaintiffs contest the constitutionality only of the care and prevention services.

"Care services" include pregnancy testing, maternity counseling, adoption and referral services, and primary and preventive health services. *See* 42 U.S.C. § 300z–1(a)(7).

"Prevention services" are services to discourage adolescent sexual relations, referral services for the treatment of venereal disease, counseling and family planning services. *See* 42 U.S.C. § 300z–1(a)(8).

With the exception of pregnancy testing, child care and transportation services, all of the care and prevention services involve some form of referral, teaching or counseling services. *See* 42 U.S.C. 300z–1(a)(4). Seven of the seventeen listed services explicitly involve education and counseling, and two involve activities intimately related to counseling—outreach and planning services. *See id.* All of these programs are targeted to help pregnant adolescents, particularly children of high school age. *See* 42 U.S.C. §§ 300z(b)(3) & 300z–1(a)(9).

Although the Court must consider the AFLA as a whole, two sections are particularly relevant to the Court's decision. First, the AFLA requires applicants to describe how they

> will, as appropriate in the provision of services ... *involve* ... *religious* and charitable *organizations,* voluntary associations, and other groups in the private sector as well as services provided by publicly sponsored initiatives....

42 U.S.C. § 300z–5(a)(21) (emphasis added). Secondly, the AFLA limits funding

to programs or projects which do not provide abortions or abortion counseling or referral, or which do not subcontract with or make any payment to any person who provides abortions or abortion counseling or referral, except that any such program or project may provide referral for abortion counseling to a pregnant adolescent if such adolescent and the parents or guardians of such adolescent request such referral; and grants may be made only to projects or programs which do not advocate, promote, or encourage abortion.

42 U.S.C. § 300z–10(a).[3]

The plaintiffs contend that these two sections, when read together, not only permit religious organizations to use government funds to provide counseling-type services, but restrict AFLA funding of religious organizations to those that oppose abortion. *See* Amended Complaint ¶¶ 2–4 (filed Dec. 29, 1983). Moreover, the plaintiffs assert that religious organizations have received AFLA funds, either directly as grant recipients or indirectly through their affiliation with secular grantees, to provide such services. For these reasons, the plaintiffs claim that the AFLA, both on its face and as applied, violates the Establishment Clause of the First Amendment.

The defendants argue that the Establishment Clause does not absolutely prohibit religious organizations from receiving government funding. The defendants contend that the AFLA permits religious organizations to provide services that are secular in purpose, and that the provision of these services does not have the primary effect of advancing religion and does not foster an excessive entanglement between government and religion.

## III. BECAUSE THE MATERIAL FACTS ARE NOT IN DISPUTE, SUMMARY JUDGMENT IS APPROPRIATE IN THIS CASE.

Pending before the Court are three cross motions for summary judgment and a mo-

---

**3.** The Court notes that it does not decide any issue relating to abortion. The only issue decided by the Court is whether the AFLA violates the Establishment Clause of the First Amendment. And the Court holds that the AFLA violates the Establishment Clause solely because the statute impermissibly involves religious organizations in the provision of education and counseling services provided under the Act.

tion for judgment on the pleadings. It is evident from the extent of the record in this case and from the motions themselves that the parties have had more than ample opportunity to submit all material pertinent to a motion for summary judgment. Therefore, the Court will treat the motion for a judgment on the pleadings under Rule 12(c) as a motion for summary judgment pursuant to Rule 56. *See* Fed.R. Civ.P. 12(c); *Public Citizen v. Lockheed Aircraft Corporation*, 565 F.2d 708, 711 n. 5 (D.C.Cir.1977). After carefully and exhaustively considering the motions, the statements of material fact not in dispute, the allegations of disputed facts, the golconda of documents submitted to the Court, and the case law, the Court finds that the material facts are not in dispute and that summary judgment is appropriate. *See* Fed.R.Civ.P. 56(c); *Celotex Corporation v. Catrett*, —— U.S. ——, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, —— U.S. ——, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

## IV. THE FEDERAL TAXPAYER PLAINTIFFS HAVE STANDING TO BRING THIS ACTION BECAUSE THEY RAISE AN ESTABLISHMENT CLAUSE CHALLENGE TO THE AFLA, WHICH WAS ENACTED PURSUANT TO THE TAXING AND SPENDING CLAUSE.

■ Article III of the Constitution demands that plaintiffs who bring a lawsuit have standing to pursue the claims that they raise. *See, e.g., Flast v. Cohen*, 392 U.S. 83, 94–99, 88 S.Ct. 1942, 1949–52, 20 L.Ed.2d 947 (1968). The defendants and defendant-intervenors do not contest plaintiffs' standing to challenge the constitutionality of the AFLA on its face. They argue instead that the plaintiffs do not have

standing to challenge the Act as applied and, therefore, this Court may not even consider the actual AFLA grantees and programs. The Court disagrees. Because the federal taxpayer plaintiffs raise an Establishment Clause challenge to an enactment pursuant to the taxing and spending clause, they satisfy the test for taxpayer standing set forth in *Flast*, 392 U.S. at 102–03, 88 S.Ct. at 1953–54.[4] Accordingly, they have standing to challenge the AFLA both on its face and as applied.

In *Flast*, the Supreme Court held that federal taxpayers have standing to challenge the constitutionality of 1) an exercise of congressional power under the taxing and spending clause[5] if 2) the basis for the challenge is that the statute violates the Establishment Clause. *See id.* at 102–03, 88 S.Ct. at 1953–54. Because the AFLA was enacted pursuant to the taxing and spending clause, *see* Plaintiffs' Statement of Material Facts ("Plaintiffs' Facts") ¶ 1, and the plaintiffs allege that the AFLA violates the Establishment Clause, *see* Amended Complaint ¶¶ 1, 49 & 50, the only question with regard to plaintiffs' standing to challenge the AFLA as applied is whether they contest an "exercise of congressional power."

This is what the defendant and defendant-intervenors deny. They argue that because the AFLA is administered by the Department of Health and Human Services ("HHS"), the plaintiffs' challenge to the AFLA as applied contests executive, rather than congressional, action. Careful consideration of the facts in the *Flast* case shows why defendants are in error.

In *Flast v. Cohen* the plaintiffs challenged the constitutionality of government funding of educational services and materials to private, largely parochial schools under the Elementary and Secondary Edu-

---

4. The Court is aware that *Flast* predates more recent Supreme Court decisions that have in part changed the law of standing. Indeed, the Court discusses at length the most important of these more recent opinions, *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). *See infra* pp. 1555–56. But neither *Valley Forge* nor any other decision has expressly overruled *Flast*, which

continues to have vitality at least insofar as subsequent decisions have not expressly contradicted its holding.

5. The taxing and spending clause provides: "The Congress shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States...." U.S. Const. art. I, § 8.

cation Act of 1965 ("Education Act"). *See* 392 U.S. at 85–88, 88 S.Ct. at 1944–46. The Education Act delegated to the Department of Health, Education and Welfare ("HEW," now HHS) the task of disbursing the funds appropriated under the Education Act in a manner consistent with the standards and restrictions established by the Act. *See id.* at 86–88, 88 S.Ct. at 1945–46. The Court held that, notwithstanding HEW's role in disbursing the appropriated funds, the funds were disbursed in accordance with congressional standards and therefore plaintiffs challenged an exercise of congressional power. *See id.* at 87, 88 S.Ct. at 1945. Accordingly, the Court also held that the logical nexus between plaintiffs' status as taxpayers and their challenge to an appropriation under the taxing and spending clause was sufficient to give plaintiffs standing. *See id.* at 102–03, 88 S.Ct. at 1953–54.

The scheme upheld in *Flast* is precisely analogous to the AFLA. Just as in the statute at issue in *Flast*, in the AFLA Congress delegated to HHS the task of disbursing the appropriated funds in a manner consistent with the standards and restrictions established by the AFLA. *See* 42 U.S.C. § 300z–2; Plaintiffs' Facts ¶ 2. By disbursing funds appropriated for the AFLA, HHS merely executes congressional power pursuant to the standards set by Congress, just as its predecessor agency did under the law upheld in *Flast.* Accordingly, *Flast*, never having been overruled, dictates a finding that the federal taxpayer plaintiffs here have challenged an exercise of *congressional* power despite HHS's role in disbursing the appropriated funds.

Notwithstanding the similarities between this case and *Flast*, the defendant and defendant-intervenors claim that this case is controlled by the Supreme Court's more recent decision in *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). The *Valley Forge* case involved the Federal Property and Administrative Services Act of 1949 ("Property Act"), which pursuant

to the property clause[6] gave HEW the power to sell the federal government's surplus real property. *See id.* at 466–67, 102 S.Ct. at 755. Under the Property Act, HEW had broad discretion to grant public benefit allowances, which effectively decreased the price of the property. *See id.* at 467, 102 S.Ct. at 755. The plaintiffs in the *Valley Forge* case challenged HEW's decision to transfer a parcel of federal property to Valley Forge Christian College and to offset the entire price of the property with a 100% public benefit allowance. *See id.* at 468, 102 S.Ct. at 756.

There is an essential difference between the executive action at issue in *Flast* and that at issue in *Valley Forge*. Unlike HEW's actions in *Flast*—and unlike HHS's actions with respect to the AFLA—HEW was not carrying out an exercise of congressional power when it gave Valley Forge Christian College a free parcel of property. *See id.* at 479 & n. 15, 102 S.Ct. at 762 & n. 15. Instead, pursuant to its broad statutory discretion, the executive agency itself decided whether and how much to offset the price of surplus federal property with a public benefit allowance. *See id.* at 468, 102 S.Ct. at 756. Unlike the plaintiffs in *Flast*, the *Valley Forge* plaintiffs could not point to a close, logical connection between their standing as taxpayers and HEW's action. Moreover, the action at issue in *Valley Forge* was not related to the taxing and spending clause but proceeded under the Property Clause of the Constitution. Consequently, the Supreme Court found that these plaintiffs did not have standing to sue. *See id.* at 479–80 & n. 17, 102 S.Ct. at 763 & n. 17.

Thus *Valley Forge* does not prevent the federal taxpayer plaintiffs in the instant case from having standing to sue. There is a sufficiently close nexus between the individual plaintiffs' standing as federal taxpayers and their challenge to the AFLA. In contrast to *Valley Forge*, but as in *Flast*, the federal taxpayer plaintiffs here maintain that an exercise of congressional power under the taxing and spending clause violates the Establishment Clause.

---

**6.** The property clause states: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States...." U.S. Const. art. IV, § 3.

Again, unlike *Valley Forge,* but as in *Flast,* the nexus between the plaintiffs' status as federal taxpayers and Congress' appropriation of AFLA funds under the taxing and spending clause is not significantly weakened by HHS's disbursement of those funds. Therefore, the federal taxpayer plaintiffs have standing to challenge the AFLA both on its face and as applied.[7]

## V. BECAUSE THE AFLA DOES NOT MAKE EXPLICIT AND DELIBERATE DISTINCTIONS AMONG RELIGIONS, THE COURT MUST USE THE TRIPARTITE TEST SET FORTH IN LEMON V. KURTZMAN TO EVALUATE THE STATUTE.

■ Having found that the plaintiffs have standing, the Court must now consider whether the AFLA comports with the Establishment Clause. Until recently, it seemed evident that a Court would use the three-part test set forth in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), when called upon to determine whether a statute comports with the Establishment Clause. In *Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), however, the Supreme Court held that a statute that explicitly and deliberately discriminates among religious denominations is suspect and must be reviewed with "strict scutiny." *See id.* at 246–47, 102 S.Ct. at 1684–85. The plaintiffs here argue that the AFLA must be reviewed under a strict scrutiny standard because it contains a denominational preference to the extent that it restricts funding to those religious organizations that oppose abortion. The Court cannot agree.

The Minnesota statute at issue in *Larson* explicitly exempted from certain state requirements any religious organization that received more than 50% of its contributions from its own members. *See id.* at 231–32, 102 S.Ct. at 1676–77. Because this "fifty percent rule" made "explicit and deliberate

distinctions" between well-established churches and "new churches" that largely depend on public solicitation, the Court tested the rule under a standard of strict scrutiny. *Id.* at 246–47 & n. 23, 102 S.Ct. at 1684 & n. 23.

*Larson's* strict scrutiny analysis, however, applies only in limited circumstances. This is clear from the Court's discussion in *Larson* of the case of *Gillette v. United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971). *Gillette* involved an Establishment Clause challenge to the Military Selective Service Act ("MSSA") of 1967, which afforded conscientious objector status to any person who, "by reason of religious training and *belief* ... was conscientiously opposed to participation in war *in any form." Id.* at 441, 91 S.Ct. at 831 (emphasis added). Thus, Quakers could object because they opposed all wars, whereas Catholics could not because they opposed only unjust wars. The Catholic plaintiff challenging the MSSA argued that strict scrutiny should apply because differences in religious beliefs only permitted members of select religions to benefit from the conscientious objector status. In *Larson,* the Supreme Court noted that, apart from the difference in religious beliefs concerning war, the *Gillette* statute did "not discriminate on the basis of religious affiliation;" the conscientious objector status was *available* on an equal basis to members of all religions. *Larson,* 456 U.S. at 246 n. 23, 102 S.Ct. at 1684 n. 23. As such, the *Larson* court found that the MSSA did not "explicitly and deliberately" discriminate against Catholics and, therefore, the tripartite *Lemon* test—not the strict scrutiny analysis—remained the proper method for analyzing the MSSA. *See id.* The *Lemon* test is the equally proper analytic tool in the case at bar.

■ If anything, the AFLA makes even fewer distinctions among religions than did the statute at issue in *Gillette.* By prohib-

---

7. Since the "case or controversy" requirement of Article III is satisfied by the standing of the federal taxpayer plaintiffs, the Court need not decide whether the clergy and the American Jewish Congress have standing. *See, e.g., Watt v. Energy Action Educational Foundation,* 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981); *Arlington Heights v. Metropolitan Hous-*

*ing Development Corp.,* 429 U.S. 252, 264 & n. 9, 97 S.Ct. 555, 562, & n. 9, 50 L.Ed.2d 450 (1977); *Buckley v. Valeo,* 424 U.S. 1, 12, 96 S.Ct. 612, 631, 46 L.Ed.2d 659 (1976) (per curiam); *ACLU v. City of St. Charles,* 794 F.2d 265, 269 (7th Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986).

iting a grant recipient from advocating abortion in an AFLA program or project, the AFLA does not condition a "benefit" on a particular religious belief but merely restricts a *program or project* from using federal tax dollars to advocate a particular course of action. *See* 42 U.S.C. § 300z–10. Although the prohibition against advocating abortion, like opposition to war in any form, may coincide or conflict with religious precepts, that fact does not require the Court to analyze the AFLA pursuant to a strict scrutiny analysis. *See Larson,* 456 U.S. at 246 n. 23, 102 S.Ct. at 1684 n. 23; *Gillette,* 401 U.S. at 441, 91 S.Ct. at 831; *see also, Bob Jones University v. United States,* 461 U.S. 574, 604 n. 30, 103 S.Ct. 2017, 2035 n. 30, 76 L.Ed.2d 157 (1983) (regulation does not violate the Establishment Clause merely because it coincides or harmonizes with the tenets of some or all religions); *Harris v. McRae,* 448 U.S. 297, 319–20, 100 S.Ct. 2671, 2689, 65 L.Ed.2d 784 (1980) (same); *McGowan v. Maryland,* 366 U.S. 420, 442, 81 S.Ct. 1101, 1113, 6 L.Ed.2d 393 (1961) (same); *Crowley v. Smithsonian Institution,* 636 F.2d 738, 742–43 (D.C.Cir.1980) (same). As such, because the AFLA does not discriminate on the basis of religious affiliation or belief, the strict scutiny test applied in *Larson* is not the proper standard by which to construe the AFLA;[8] rather, the AFLA must be tested under the three-part test set forth in *Lemon v. Kurtzman.*

## VI. ALTHOUGH THE AFLA HAS A VALID SECULAR PURPOSE, IT IS UNCONSTITUTIONAL ON ITS FACE BECAUSE IT HAS THE PRIMARY EFFECT OF ADVANCING RELIGION AND FOSTERS AN EXCESSIVE ENTANGLEMENT BETWEEN GOVERNMENT AND RELIGION, AND IT IS UNCONSTITUTIONAL AS APPLIED BECAUSE IT HAS THE PRIMARY EFFECT OF ADVANCING RELIGION.

■ The appropriate test for determining whether the AFLA violates the Estab-

lishment Clause is set forth in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). To withstand scrutiny under the *Lemon* test the AFLA 1) must have a valid secular purpose, 2) must not have the primary effect of advancing or inhibiting religion, and 3) must not foster excessive entanglement between government and religion. *See id.* at 612–13, 91 S.Ct. at 2111. If the AFLA fails *any one* of these three parts of the *Lemon* test, then the Court must declare the statute unconstitutional.

■ In addition, political divisiveness, while never the only ground for holding a statute unconstitutional, is a fourth factor often considered by courts. A statute that causes political division along religious lines is more likely to offend the Establishment Clause than one that does not. *See Meek v. Pittenger,* 421 U.S. 349, 365 n. 15, 372, 95 S.Ct. 1753, 1763 n. 15, 1766–67, 44 L.Ed.2d 217 (1975); *Lemon,* 403 U.S. at 622–25, 91 S.Ct. at 2115–17; *Committee for Public Education and Religious Liberty v. Nyquist,* 413 U.S. 756, 794–98, 93 S.Ct. 2955, 2976–78, 37 L.Ed.2d 948 (1973); *Tilton v. Richardson,* 403 U.S. 672, 688–89, 91 S.Ct. 2091, 2100–01, 29 L.Ed.2d 790 (1971); *Walz v. Tax Commission,* 397 U.S. 664, 698–700, 90 S.Ct. 1409, 1426–27, 25 L.Ed.2d 697 (1970) (Harlan, J., concurring); *Board of Education v. Allen,* 392 U.S. 236, 249, 88 S.Ct. 1923, 1929, 20 L.Ed.2d 1060 (1968) (Harlan, J., concurring); *see also Lynch v. Donnelly,* 465 U.S. 668, 689, 104 S.Ct. 1355, 1367, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring) (political divisiveness is not an independent test of constitutionality). Therefore, the Court will assess whether the AFLA may, or has, caused political division along religious lines, even though this factor has never been held to be dispositive.

The Court will now consider each of these four factors in turn.

---

**8.** Even if strict scrutiny were the appropriate test, the Court's holding would likely be no different. Under strict scrutiny, a law is invalid unless it serves a compelling governmental interest and is narrowly tailored to further that interest—a test that is, if anything, more stringent than the tripartite *Lemon* test. *See Larson,* 456 U.S. at 246–47, 102 S.Ct. at 1684–85.

### A. *The AFLA Has a Valid Secular Purpose of Combating Teenage Pregnancy and Associated Ills.*[9]

■ Courts invalidate legislation or governmental action on the ground that it lacks a valid secular purpose only when the statute or activity involved is motivated *wholly* by religious considerations. *See Lynch,* 465 U.S. at 680, 104 S.Ct. at 1362; *Stone v. Graham,* 449 U.S. 39, 41, 101 S.Ct. 192, 193, 66 L.Ed.2d 199 (1980) (per curiam); *Epperson v. Arkansas,* 393 U.S. 97, 107–09, 89 S.Ct. 266, 272–73, 21 L.Ed.2d 228 (1968); *Abington School District v. Schempp,* 374 U.S. 203, 223–24, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963); *Engel v. Vitale,* 370 U.S. 421, 424–25, 82 S.Ct. 1261, 1263–64, 8 L.Ed.2d 601 (1962). Even when the benefits to religion are substantial, and motivation to advance or benefit religion is apparent, courts have found no conflict with the Establishment Clause as long as they can discern some intended and valid secular purpose. *See Lynch,* 465 U.S. at 680, 104 S.Ct. at 1362. Contrary to the plaintiffs' claim that the asserted purpose of the statute is pretextual, the Court finds that the AFLA has a valid secular purpose and its purpose therefore does not offend the Establishment Clause.

As mentioned on pages 8–9, above, the AFLA was motivated by Congress' concern that teenage pregnancy and premarital sexual relations are very damaging to society and, particularly, to adolescents.[10] The AFLA funds care, prevention and research projects intended to alleviate the causes and consequences of these problems. *See* 42 U.S.C. §§ 300z(b). Specifically, the AFLA encourages parents and family members to provide guidance and support to adolescents by promoting prudent approaches, such as self-discipline, to the problem of premarital sexual relations. *Id.* It promotes adoption, establishes innovative, comprehensive and integrated care services for pregnant adolescents, and supports research and demonstration projects concerning the causes and consequences of adolescent premarital sexual relations, contraceptive use, pregnancy and child rearing. *See id.* The statute also funds research on alleviating the negative consequences of adolescent premarital sexual relations and pregnancy, and it provides funds for disseminating the results and findings of these programs. *See* 42 U.S.C. § 300z(b)(4)–(b)(6).

The Court can only conclude from the indisputable language of the AFLA that the statute's purpose was to solve the prob-

---

**9.** However, as explained in section VI, subsections B and C, *see infra* pp. 1560–68, the statute is unconstitutional, despite its valid purposes, because of its primary effect of advancing religion and its excessive entanglement of government and religion.

**10.** Congress found that:

(1) in 1978, an estimated one million one hundred thousand teenagers became pregnant; more than five hundred thousand teenagers carried their babies to term, and over one-half of the babies born to such teenagers were born out of wedlock;

(2) adolescents aged seventeen and younger accounted for more than one-half of the out of wedlock births to teenagers;

(3) in a high proportion of cases, the pregnant adolescent is herself the product of an unmarried parenthood during adolescence and is continuing the pattern in her own lifestyle;

(4) it is estimated that approximately 80 per centum of unmarried teenagers who carry their pregnancies to term live with their families before and during their pregnancy and remain with their families after the birth of the child;

(5) pregnancy and childbirth among unmarried adolescents, particularly young adolescents, often results in severe adverse health, social and economic consequences, including: a higher percentage of pregnancy and childbirth complications; a higher incidence of low birth weight babies; a higher frequency of developmental disabilities; higher infant mortality and morbidity; a decreased likelihood of completing schooling; a greater likelihood that an adolescent marriage will end in divorce; and higher risks of unemployment and welfare dependency;

. . . .

(7) an unmarried adolescent who becomes pregnant once is likely to experience recurrent pregnancies and childbearing, with increased risks;

. . . .

(8)(A) the problems of adolescent premarital sexual relations, pregnancy and parenthood are multiple and complex and are frequently associated with or are a cause of other troublesome situations in the family. . . .

42 U.S.C. § 300z(a).

lems caused by teenage pregnancy and premarital sexual relations. This is a valid secular purpose.[11] This conclusion is buttressed by the uncontroverted fact that a significant amount of AFLA grants have been awarded to non-sectarian grantees to provide care and counseling services to adolescents. That these secular purposes coincide or conflict with religious tenets does not transform them into sectarian purposes motivated *wholly* by religious considerations. *Cf. Bob Jones University v. United States*, 461 U.S. 574, 604 n. 30, 103 S.Ct. 2017, 2035 n. 30, 76 L.Ed.2d 157 (1983); *Harris v. McRae*, 448 U.S. 297, 319–20, 100 S.Ct. 2671, 2689, 65 L.Ed.2d 784 (1980); *McGowan v. Maryland*, 366 U.S. 420, 442, 81 S.Ct. 1101, 1113, 6 L.Ed.2d 393 (1961); *Crowley v. Smithsonian Institution*, 636 F.2d 738, 742–43 (D.C.Cir.1980). The Court must therefore find that the AFLA, both on its face and as applied, was not motivated *wholly* by religious considerations but has a valid secular purpose.

The plaintiffs admit that the AFLA incorporates some secular values, *see* Plaintiffs' Motion for Summary Judgment at 33 n. 57, but they argue that the real purpose of the AFLA can properly be determined only in light of the AFLA's predecessor statute— Title VI of the *Public Health Service Act.* The plaintiffs contend that a comparison of the AFLA and Title VI demonstrates that the AFLA was motivated wholly by religious considerations. The critical fact, argue the plaintiffs, is that Title VI was specifically amended to involve religious organizations. Title VI required applicants to describe how they will involve public and private agencies, *see* Title VI § 605(a)(7), whereas the AFLA explicitly requires applicants to describe how they

> will ... involve families, ... religious and charitable organizations, voluntary associations, and other groups in the private sector as well as services provided by publicly sponsored initiatives....

42 U.S.C. § 300z–5(a)(21).

Even admitting this difference between Title VI and the AFLA, the Court cannot find that the AFLA was motivated *wholly* by religious considerations. First, Title VI was amended not only to add religious organizations to the list of entities that may participate in AFLA programs, but also to add families, charitable organizations, voluntary associations and other groups. *See* 42 U.S.C. § 300z–5(a)(21)(B). Religious organizations are only one of five types of entities that may be involved in an AFLA program. Secondly, at most, only the language permitting the involvement of religious organizations was motivated by religious considerations. This, however, does not mean that the entire AFLA was motivated *wholly* by religious considerations, as it would have to be in order to find that the AFLA has no valid secular purpose. Other reasons, such as the need for greater resources, more programs, and earlier intervention also motivated Congress to amend Title VI. *See* S.Rep. No. 97–161, 97th Cong. 1st Sess. 7–9 (1981). Finally, and most important, religious organizations can play a vital role in furthering secular values, a fact that even plaintiffs admit.[12]

---

**11.** The plaintiffs rely on *Stone v. Graham*, 449 U.S. 39, 41, 101 S.Ct. 192, 193, 66 L.Ed.2d 199 (1981), to support their argument that an "avowed secular purpose" is not sufficient to avoid conflict with the First Amendment if it is merely a pretext for a purpose that is actually religious. Plaintiffs' legal theory is correct, but it is not applicable to the facts of this case. The "secular" purpose declared pretextual in *Stone* was a self-serving notation, in small print at the bottom of copies of the Ten Commandments, that the Ten Commandments have a secular application. *See id.* at 41, 101 S.Ct. at 193. The AFLA is clearly devoid of the religious overtones associated with the Ten Commandments.

*Amici Curiae* argue that the AFLA does not have a valid secular purpose because it involves religious organizations in a program whose objectives could equally be met without those groups. To support this argument, *amici* rely on *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 123–24, 103 S.Ct. 505, 510, 74 L.Ed.2d 297 (1982). *See Amici Curiae* Memorandum in Support of Plaintiffs' Motion for Summary Judgment at 5 (Feb. 25, 1985). *Larkin*, however, does not support this contention. Although in *Larkin* the Supreme Court noted that the statute's secular objectives could be accomplished by other means, the secular purpose of that statute was not challenged. *See Larkin*, 459 U.S. at 119, 124, 103 S.Ct. at 510. Indeed, the Court stated that "[t]here can be little doubt that this [statute] embraces valid secular purposes." *Id.* at 124, 103 S.Ct. at 510. Thus, *Larkin* does not affect the Court's decision that the AFLA has a valid secular purpose.

**12.** The plaintiffs state that "there is no doubt that religion can play an important role in ad-

Accordingly, notwithstanding that Title VI was amended to permit religious organizations to be involved in AFLA programs, the Court finds that the AFLA was not motivated *wholly* by religious considerations but has a valid secular purpose. This does not save the AFLA, however, as it fails the other elements of the nexus text. *See* subsections B & C, *infra* pp. 26–26.

B. *On Its Face and As Applied, the AFLA Has the Primary Effect of Advancing Religion Because of Its Use of Religious Organizations for Education and Counseling of Teenagers on Matters Relating to Religious Doctrine.*

1. *The legal standard of primary effect*

As noted above, a particular statute is not immunized from further scrutiny merely because it has a valid secular purpose. *See, e.g., Grand Rapids School District v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 3223, 87 L.Ed.2d 267 (1985). A Court must then proceed to consider whether that statute comports with the remaining elements of the guidelines synthesized in *Lemon v. Kurtzman,* namely, whether it has a primary effect of advancing religion and whether it fosters excessive entanglement between government and religion. *See, e.g., id.*

The second prong of the *Lemon* test requires this Court to determine whether the AFLA's "primary effect [is] one that neither advances nor inhibits religion." 403 U.S. at 612, 91 S.Ct. at 2111. The Court finds that the AFLA both on its face and as applied has the primary effect of advancing religion and, therefore, violates the Establishment Clause. Because the same legal principles apply both to a facial and an "as applied" inquiry, the Court will begin by setting forth the applicable law.

First, the test does not require a Court to determine which effects of the AFLA are "primary" and which less so. While comparisons are inherent in the primary effect inquiry, these need not, and should not, rise to the level of "metaphysical judgments" about the paramountcy of a statute's alleged religious effect. *See Committee for Public Education and Religious Liberty v. Nyquist,* 413 U.S. 756, 783 n. 39, 93 S.Ct. 2955, 2971 n. 39, 37 L.Ed.2d 948 (1973). As the Supreme Court has made clear,

a law found to have a 'primary' effect [of] promot[ing] some legitimate end under the State's police power is [not] immune from further examination to ascertain whether it *also* has the direct and immediate effect of advancing religion.

*Id.* (emphasis added).

Subsequent decisions have illuminated the role that consideration of "direct and immediate effect" must play in the "primary effect" inquiry. Where the connection between a statute and religion is apparent from the face of the statute, and the benefit conferred upon religion is not an historical fact but a recent innovation, the Supreme Court instructs us to examine whether the statute has a "direct and immediate" effect, or a "remote and incidental" effect, of advancing or inhibiting religion. *See, e.g., Estate of Thornton v. Caldor, Inc.,* 472 U.S. 703, 710, 105 S.Ct. 2914, 2918, 86 L.Ed.2d 557 (1985) (state law requiring employers to give employees' Sabbath off "goes well beyond having an 'incidental or remote' effect of advancing religion"); *Lynch v. Donnelly,* 465 U.S. 668, 683, 104 S.Ct. 1355, 1364, 79 L.Ed.2d 604 (1984) (endorsement of religion effected by creche "indirect, remote, and incidental"); *Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 125–26, 103 S.Ct. 505, 511, 74 L.Ed.2d 297 (1982) (statute had direct effect of advancing religion by giving churches "veto" over location of bar within 100 yards of church); *Committee for Public Education and Religious Liberty v. Nyquist,* 413 U.S. at 783–85, 93 S.Ct. at 2970–71 (use of state

vancing *secular values* of mental health, transmitting ethical values, thoughtful decision making about sexual behavior, and decreasing teenage pregnancy rates...." Plaintiffs' Motion for Summary Judgment at 33. As the Senate Committee stated: "Charitable organizations with religious affiliations historically have provided social services with the support of communities and without controversy." S.Rep. No. 496, 98th Cong., 2d Sess. 10 (1984).

tax dollars for maintenance and repair of non-public school buildings had direct and immediate effect of advancing religion). Thus, if the AFLA is such a statute, and it "directly and immediately," as opposed to "remotely and incidentally," advances religion, this Court must find that it is unconstitutional.

In contrast, where the connection to religion is not apparent on the face of the statute or from the nature of the government act itself, a court must consider whether the intended or actual beneficiary of government favor is "an institution in which religion is so pervasive that a substantial portion of its functions are [sic] subsumed in the religious mission." *Hunt v. McNair*, 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973). If not, a court must go on to consider whether the statute "funds a religious activity in an otherwise substantially secular setting." *Id.* Thus, if the entities benefitting from AFLA funds are either "pervasively sectarian," or if the funds are not *entirely* segregated from religious activity, the government plan impermissibly advances religion and is unconstitutional. *See, e.g., id.* (revenue bonds issued by state for religiously affiliated college constitutional because college not pervasively sectarian and state-supplied money entirely segregable from religious activity).

■ In sum, if the connection between religion and the challenged government statute or practice is clear from the face of the statute, the Court must determine whether that statute has the "direct and immediate" effect of advancing religion. Where the connection is less obvious, the Court must consider whether the government has benefitted or burdened a pervasively sectarian institution or has funded religious activity.

■ To be sure, this analysis is put more neatly than the many decisions that form its base. *See supra* pp. 1560–61. Particularly important for this Court's analysis of the AFLA, those decisions often mention other "sub-criteria" that pertain to both of these broad analytic constructs. First, the AFLA may not allow participants in a government-funded program to "intentionally or inadvertently inculcat[e] particu-

lar religious tenets or beliefs." *Grand Rapids School District v. Ball*, 105 S.Ct. at 3223; *see also Stone v. Graham*, 449 U.S. 39, 41–43, 101 S.Ct. 192, 193–94, 66 L.Ed.2d 199 (1980) (per curiam); *Meek v. Pittenger*, 421 U.S. 349, 370–71, 95 S.Ct. 1753, 1765–66, 44 L.Ed.2d 217 (1975); *Lemon*, 403 U.S. at 619, 91 S.Ct. at 2114. Such government-sponsored indoctrination is "absolutely prohibited" by the Establishment Clause. *Grand Rapids*, 105 S.Ct. at 3224; *see also, Wolman v. Walter*, 433 U.S. 229, 250, 97 S.Ct. 2593, 2606, 53 L.Ed.2d 714 (1977); *Board of Education v. Allen*, 392 U.S. 236, 245, 88 S.Ct. 1923, 1927, 20 L.Ed.2d 1060 (1968).

■ Nor may AFLA programs, which involve "impressionable youngsters," such as adolescents, "provide a crucial symbolic link between government and religion, thereby enlisting, at least in the eyes of [those] youngsters, the powers of government to the support of the religious denomination" that provides educational services. *Grand Rapids*, 105 S.Ct. at 3223–34; *see also Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977). This symbolic link is impermissible even absent attempts to inculcate religious belief. Government funding of educational services, and the resulting identification of government with religion, violates a core purpose of the Establishment Clause if it conveys a message of government endorsement of religion in general or of a particular religion that benefits from government largesse. *Grand Rapids*, 105 S.Ct. at 3226; *see also, Lynch v. Donnelly*, 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring).

■ Finally, and perhaps most obviously, AFLA money cannot impermissibly subsidize "the primary religious mission" of the institutions that receive public funds. *Grand Rapids*, 105 S.Ct. at 3226; *see also, Committee for Public Education and Religious Liberty v. Regan*, 444 U.S. 646, 657, 100 S.Ct. 840, 848, 63 L.Ed.2d 94 (1980); *Levitt v. Committee for Public Education and Religious Liberty*, 413 U.S. at 472, 93 S.Ct. at 2814; *Committee for Public Education and Religious Liberty v.*

*Nyquist,* 413 U.S. at 774–81, 93 S.Ct. at 2966–69. While indirect aid of a religious mission is not *per se* impermissible, where the aid amounts to a subsidy of the religious organization, and that subsidy cannot be segregated from religious activity, the courts have declared the subsidy unconstitutional without hesitation. *Grand Rapids,* 105 S.Ct. at 3225 (state-funded "remedial" and "enrichment" programs for students in sectarian schools and on "state-leased" classrooms in sectarian schools not segregated from religious activity); *see also Wolman v. Walter,* 433 U.S. at 248–51, 97 S.Ct. at 2605–07 (state funding of unsupervised field trips and instructional material and equipment for sectarian schools not segregated from religious activity); *Meek v. Pittenger,* 421 U.S. at 366, 95 S.Ct. at 1763 (state funding of instructional material for sectarian schools not segregated from religious activity).

These several related principles are the guideposts for this Court to use in considering whether the AFLA has the primary effect of advancing or inhibiting religion. It is to the AFLA itself that the Court must now turn.

2. *On its face, the AFLA has the primary effect of advancing religion because it funds teaching and counseling of adolescents by religious organizations on matters related to religious doctrine.*

The Adolescent Family Life Act is based in part on a finding of Congress that the problems of adolescent premarital sexual relations and pregnancy "are best approached through a variety of integrated and essential services provided to adolescents and their families by ... religious ... organizations." 42 U.S.C. § 300z(a)(8)(B). Accordingly, applicants for grants under that program must describe how they

> will, as appropriate in the provision of services ... (B) involve religious ... organizations."

42 U.S.C. § 300z–5(a)(21)(B) (emphasis added). The "services" that these organizations must provide are the "necessary services" defined by the Act. *See id.* at § 300z–1(a)(4). Seven of the seventeen listed services explicitly involve "education" or

"counseling." *Id.* at §§ 300z–1(a)(4)(A), (B), (D), (G), (H), (L) & (M). Two others involve activities intimately related to education and counseling, "outreach services to families of adolescents to discourage sexual relations among unemancipated minors" and "family planning services." *Id.* at § 300z–1(a)(4)(O) & (P).

Certain conclusions are immediately obvious from a reading of these provisions. First, the statute does not state that "religious organizations" shall receive AFLA grants; indeed, it is conceivable that a grantee could convince a religious organization to participate without remuneration. To intepret the religious organization's involvement in such a light is, however, to ignore both Congressional intent and the import of the statute as a whole.

The legislative history of these provisions shows without doubt that Congress intended religious organizations to participate in these programs as grantees and as paid or unpaid participants in grants awarded to other organizations. *See* S.Rep. 161, 97th Cong., 1st Sess., 15–16 (1981). Even more important, the statute, taken as a whole, explicitly permits religious organizations to be grantees and envisions a direct role for those organizations in the education and counseling components of AFLA grants. *See especially* 42 U.S.C. § 300z–5(a)(21)(B). Thus, the Court can only conclude that this clear connection between religious organizations and the federally funded AFLA programs dictates use of the "direct and immediate" effect analysis.

Second, the statute's "direct and immediate" effect of advancing religion is easy to see from the statute's emphasis on "education" and "counseling." Put plain, these functions amount to *teaching* by grant recipients and subcontractors, including religious organizations, about the harm of premarital sexual relations and the factors supporting a choice of adoption rather than abortion, and these matters are fundamental elements of religious doctrine. Moreover, the AFLA contains no restriction whatsoever against the teaching of religion *qua* religion or any attempt to use the

education and counseling process to "intentionally or inadvertently" inculcate religious belief.[13]

This may best be shown by a related, and at least equally important, section of the AFLA. That provision reads in full:

> Grants or payments may be made only to programs or projects which do not provide abortions or abortion counseling or referral, or which do not subcontract with or make any payment to any person who provides abortions or abortion counseling or referral, except that any such program or project may provide referral for abortion counseling to a pregnant adolescent if such adolescent and the parents or guardians of such adolescent request such referral; and grants may be made only to projects or programs which do not advocate, promote, or encourage abortion.

*Id.* at § 300z–10.

It is a fundamental tenet of many religions that premarital sex and abortion are wrong, even sinful. *See United States v. Dykema,* 666 F.2d 1096, 1104 (7th Cir. 1981), *cert. denied,* 456 U.S. 983, 102 S.Ct. 2257, 72 L.Ed.2d 861 (1982) (judicial notice taken of religious beliefs); *United States v. Kahane,* 396 F.Supp. 687, 692 (E.D.N.Y.), *aff'd and modified on other grounds,* 527 F.2d 492 (2d Cir.1985) (same); *see also Memorandum in Support of Plaintiff's Motion for Summary Judgment,* at 22. The AFLA does not prohibit these religions from receiving AFLA grants. Thus, by contemplating the provision of aid to organizations affiliated with these religions—aid for the purpose of encouraging abstinence and adoption—the AFLA contemplates subsidizing a fundamental religious mission of those organizations.

To presume that AFLA counselors from religious organizations can put their beliefs aside when counseling an adolescent on matters that are part of religious doctrine is simply unrealistic. *See, e.g., Grand Rapids,* 105 S.Ct. at 3225. Even if it were possible, government would tread impermissibly on religious liberty merely by suggesting that religious organizations instruct *on doctrinal matters* without any conscious or unconscious reference to that doctrine. Moreover, the statutory scheme is fraught with the possibility that religious beliefs might infuse instruction and never be detected by the impressionable and unlearned adolescent to whom the instruction is directed. *This possibility alone amounts to an impermissible advancement of religion. Grand Rapids,* 105 S.Ct. at 3225. And the danger here is far greater than in *Grand Rapids,* which involved classroom education, as the AFLA contemplates one-on-one counseling, a situation in which there are few discernable constraints. The possibility that religious organizations will exert pressure on "matters sacred to conscience" is inherent in this counseling, and it renders the program invalid. *See McCollum v. Board of Education,* 333 U.S. 203, 227, 68 S.Ct. 461, 473, 92 L.Ed. 649 (1948) (Frankfurter, J., concurring); *see also Engel v. Vitale,* 370 U.S. 421, 431, 82 S.Ct. 1261, 1267, 8 L.Ed.2d 601 (1962).

Similarly, the involvement of religious organizations in counseling and education

---

**13.** This absence of any statutory prohibition on inculcation of religious belief puts the AFLA in a class by itself. The Court knows of no other statutory scheme that expressly contemplates religious involvement in a government-funded program and does not attempt to segregate inculcation of religious belief from public financial support. Nor can the Court assume that such a condition exists: "where Congress intends to impose a condition on the grant of federal funds, 'it must do so unambiguously.'" *School Board of Nassau County v. Arline,* —— U.S. ——, 107 S.Ct. 1123, 1132, 94 L.Ed.2d 307 (1987) (Rehnquist, C.J., dissenting) (*quoting Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981)). While the Court is aware that HHS's "Notice of Grant Award" specifies that grants may not be used to "teach or promote religion," this is neither a statutory prohibition nor an official administrative regulation. It is merely an unpublished administrative warning that was written at agency discretion and can be revoked by agency fiat. No case permits a Court to find that such a discretionary statement adequately protects against sectarian use of public funds. The Court is also aware that defendant claims that HHS officials verbally advised grantees that they may not use AFLA funds to teach religion. Even if true, the fact that HHS warnings may undo some of the statute's damage does not solve the problem with the statute itself, and it is with the statute alone that a facial inquiry is concerned.

on premarital sex, abstinence, and the preferability of adoption to abortion creates a "crucial symbolic link" between government and religion when the counseling is funded by the public fisc. This symbolic link is quite strong where the education is directed at adolescents, especially pregnant adolescents who may be in a delicate and more than ordinarily receptive state of mind. And it is particularly strong where, as here, the subjects taught are, in the hands of a "religious organization," inescapably infused with religious beliefs. *See, e.g., Grand Rapids*, 105 S.Ct. at 3226; *McCollum v. Board of Education*, 333 U.S. at 227, 68 S.Ct. at 473; *Felton v. Secretary of Education*, 739 F.2d 48, 67–68 (2d Cir.1984), *aff'd sub nom., Aguilar v. Felton*, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985).

In short, the AFLA on its face has the primary effect of advancing religion. This alone would force the Court to declare the law constitutionally infirm. But, as noted above, because Establishment Clause case law has not always neatly demarcated a facial challenge from a challenge to a law as applied, this Court will consider whether the AFLA, as applied, has the primary effect of advancing or inhibiting religion.

### 3. *As applied, the AFLA has the primary effect of advancing religion.*

The undisputed record before the Court transforms the inherent conflicts between the AFLA and the Constitution into reality.[14] These facts reveal that AFLA grantees and subgrantees have included several organizations with institutional ties to religious denominations and corporate requirements that the organizations abide by and not contradict religious doctrines. In addition, other recipients of AFLA funds, while not explicitly affiliated with a religious denomination, are religiously inspired and dedicated to teaching the dogma that inspired them. While the Court will not engage in an exhaustive recitation of the record, references to representative portions of the record reveal the extent to which the AFLA has in fact "directly and immediately" advanced religion, funded "pervasively sectarian" institutions, or permitted the use of federal tax dollars for education and counseling that amounts to the teaching of religion.

Consider first St. Margaret's Hospital, a self-described "Christian institution" committed to acting "in harmony with the teaching of the Catholic Church." Plaintiffs' Facts, Volume 3, St. Margaret's, ¶ 7. At least one AFLA-funded employee of St.

---

**14.** To support their summary judgment motion, plaintiffs prepared a three-volume, four-hundred page "Statement of Undisputed Material Facts" that quoted extensively from the exceptionally large record in this case and cited to the exact place in the record where each quotation could be found. Such a statement is precisely what our local rules and the more generally applicable federal rules of summary judgment law require. Defendant's response to plaintiffs' submission was also lengthy, but the difference in content was significant. Most of defendant's "disputes" of plaintiffs' facts were unsupported disagreements, complaints that a quote had been taken out of context, or the word "dispute" with a reference to the page in the multi-volume record at which the Court could look up an undescribed disagreement and decide for itself whether the effort was worthwhile. Defendant also "controverts" some of plaintiffs' facts with "declarations to be supplied later." The Court knows of no such later-filed declarations, and the docket sheets retained by the Clerk of the Court do not show that these declarations were supplied. It should go without saying that such a "response" does not comport with the command of Local Rule 108(h), formerly Local Rule 1–9(h), which states that an opposition to a summary judgment motion "shall be accompanied by a separate concise statement of genuine issues *setting forth all material facts* as to which it is contended there exists a genuine issue necessary to be litigated...." (emphasis added). The Rule adds that a fact is to be taken as admitted unless properly controverted. The Court has done precisely that. It regards as "disputed" all facts pointed to by plaintiff and disputed on the basis of identified evidence in the record that actually makes the point claimed by defendant. As Rule 108(h) requires, the Court takes as uncontroverted all other facts pointed to by plaintiffs. *See, e.g., Catrett v. Johns-Manville Sales Corp.*, 756 F.2d 181, 190 (D.C.Cir.1985) (Bork, J., dissenting) ("So long as the plaintiff has even one iota of weak inferential evidence, defendants will have the burden of affirmatively attacking that evidence to prove that there is no factual dispute suitable for trial."), *rev'd sub nom. on other grounds Celotex Corp. v. Catrett*, ⸺ U.S. ⸺, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Margaret's was told that she must follow the directives set forth in "Ethical and Religious Directives of Catholic Facilities." *Id.* at ¶¶ 7, 10. Similarly, subgrantees of St. Ann's Infant and Maternity Home, which are affiliated with the Catholic Archdiocese of Washington, may not counsel or refer patients for abortions; nor do they encourage any method of birth control not permitted by Catholic doctrine. *Id.* at Volume 1, St. Ann's, ¶¶ 11, 33. Significantly, these subgrantees are solely responsible for the family planning component of St. Ann's AFLA program, so the church-directed restrictions on counseling are highly pertinent. *Id.* at ¶ 24. Moreover, the projects are directed by members of religious orders, which base their curriculum on materials with explicitly religious content.[15] *Id.* at ¶¶ 76–77.

Similarly, among the "purposes" listed in the Articles of Incorporation of Lutheran Family Services is:

> To promote the extension of the kingdom of God through compassionate Christian love and to aid the Lutheran Churches in Iowa to fulfill their responsibilities of compassion and love.... To promote the general welfare of children, families and individuals within the realistic resources of the corporation, ... and *the teachings of the Lutheran Church.*

*Id.* at Lutheran Family Services, ¶ 3 (emphasis added).

All told, the record reveals that at least ten AFLA grantees or subgrantees were themselves "religious organizations" in the sense that they have explicit corporate ties to a particular religious faith and by-laws or policies that prohibit any deviation from religious doctrine.[16] The religious character of other AFLA grantees or subgrantees is not as explicit but is nonetheless indisputable.

Family of the Americas Foundation ("FAF"), for instance, is an affiliate of "WOOMB–International," an organization without discernable religious ties. But WOOMB's "Aims and Objectives" states that the organization was "inspired by the Encyclical *Humane Vitae*," *id.* at FAF ¶ 8, the papal encyclical setting forth Catholic dogma on birth control and abortion. Publications used by, published by, and conferences sponsored by the Family of the Americas Foundation have largely been devoted to explicating the doctrine set forth by the *Humane Vitae* as well as other religious precepts. Plaintiff's Facts, Volume 2, FAF, ¶¶ 36–51, 66–75, 85, 88–96, 103, 109. Indeed, FAF's Executive Director has stated that she "reports" to the Pope on behalf of the organization. *Id.* at ¶ 13. Other documents buttress this connection between FAF and the Catholic Church. *Id.* at ¶¶ 16–17.

These explicit or implicit corporate policies might give less pause with respect to a federal program that did not implicate religious tenets. But the situation here is quite different. Because these religious organizations use federal funds to educate or counsel on matters inseparable from religious dogma, the constitutional implications of the grants are clear and clearly troubling: the inescapable conclusion is that federal funds have been used by pervasively sectarian institutions to teach matters inherently tied to religion.

The record demonstrates that some grantees have included explicitly religious materials, or a curriculum that indicates an intent to teach theological and secular views on sexual conduct, in their HHS-approved grant proposals. *E.g.,* Plaintiff's Facts, Volume 2, Catholic Charities of the Diocese of Arlington, ¶ 17; *Id.,* Search In-

---

**15.** The Court understands that there is a dispute as to whether this religious material was taught, but there is no dispute that the cirriculum that was taught was at least based on these materials, which spoke in terms of Church teachings on sexual matters and contained several references to God. *See* Volume 1, St. Ann's, ¶¶ 76–77.

**16.** These organizations are: (Plaintiff's Facts, Volume 1): St. Ann's Infant and Maternity

Home; Center for Life of Providence Hospital, Washington, D.C.; Catholic Charities of Washington, D.C.; (Plaintiff's Facts, Volume 2): Family Life Bureau of the Diocese of St. Cloud, Mn.; Catholic Charities of the Diocese of Arlington, Va.; Catholic Family Services of Amarillo, Tx.; Catholic Family Services of Wayne County, Mich; (Plaintiff's Facts, Volume 3:) St. Margaret's Hospital; Catholic Social Services of SW Ohio; Lutheran Family Services.

stitute, ¶¶ 24, 32; *Id.* at Volume 3, St. Margaret's, ¶¶ 29, 86–90, 113. One such application, which was funded for one year, included a program designed, *inter alia,* "to communicate the Catholic diocese, Mormon (Church of Jesus Christ of Latter Day Saints) and Young Buddhist Association's approaches to sex education." *Id.*, Maternal and Child Health Department of Health [sic] ¶ 2.

 Nor do the facts suggest that the programs in operation cured the First Amendment problems evident from these approved grant applications. At least one grantee actually included "spiritual counseling" in its AFLA program. *Id.*, SUMA, ¶ 16. Other AFLA programs used curricula with explicitly religious materials. *E.g.,* *id.*, St. Margaret's ¶¶ 86–90; Camden County ¶¶ 8, 15. In addition, a very large number of AFLA programs took place on sites adorned with religious symbols—*precisely* the "crucial symbolic link" between religion and government that Establishment Clause jurisprudence has cautioned against, particularly where youngsters are involved. *E.g.,* *id.* at Volume 2, Catholic Charities of Arlington, ¶¶ 43–45, 49; CASI, ¶¶ 22–23, 28–30; Volume 3, St. Margaret's, ¶ 24; Lyon County, ¶¶ 23–24.[17]

 Similarly, the record reveals that some grantees attempted to evade restrictions they perceived on AFLA-funded religious teaching by establishing programs in which an AFLA-funded staffer's presentations would be immediately followed, in the same room and in the staffer's presence, by a program presented by a member of a religious order and dedicated to presentation of religious views on the subject covered by the AFLA staffer. *E.g.,* *id.* at Volume 2, Catholic Charities of the Diocese of Arlington, ¶¶ 102–119, 132–40. This transparent attempt to isolate the sectarian from the secular is unconvincing; indeed, the joint presence of denominational personnel and federally funded employees reinforces the impermissible symbolic tie, if not an actual tie, between government and religion. *See, e.g., Grand Rapids,* 105 S.Ct. at 3226; *Larkin v. Grendel's Den, Inc.,* 459 U.S. at 125–26, 103 S.Ct. at 511.

Equally disturbing, the overwhelming number of comments shows that program participants believed that these federally funded programs were also sponsored by the religious denomination. *E.g.,* Plaintiff's Facts, Volume 3, Lutheran Family Services, ¶ 21; Northwest Louisiana Adolescent Family Life Project, ¶¶ 6–8. This appearance of joint action provides a significant symbolic benefit to religion altogether at odds with the First Amendment's demand of scrupulous neutrality between religion and non-religion. *E.g., Larkin,* 459 U.S. at 125–26, 103 S.Ct. at 511; *Everson v. Board of Education,* 330 U.S. 1, 8–13, 67 S.Ct. 504, 507–10, 91 L.Ed. 711 (1947).

 In sum, the facts demonstrate beyond peradventure the effect of the Adolescent Family Life Act programs. The Act creates an explicit connection between a state-sponsored program, a religiously identified organization, and either a religious-inspired curriculum or a classroom replete with religious symbols. *See supra* pp. 1563–65. Such a relationship inescapably amounts to the "significant symbolic benefit to religion" that government may not bestow. *Larkin,* 459 U.S. at 125–26, 103 S.Ct. at 511. Moreover, to the extent that AFLA grantees were religious organizations that used AFLA grants to "educate" or "counsel" on the basis of a religious or religiously inspired curriculum, *see supra* pp. 1565–66, the funds went to sectarian institutions for purposes indistinguishable from their religious aims.

In short, defendant has approved AFLA grants and distributed AFLA funds in a manner that advances religion, regardless

---

**17.** Throughout its "Statements" in response to plaintiffs' Rule 108(h) submissions, defendant terms "irrelevant" the fact that AFLA programs were held in rooms full of religious symbols. Defendant is quite wrong: nothing could be clearer than the Establishment Clause's prohibition against locating publicly funded classes in rooms with religious symbols and other religious decorations. *See, e.g., Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985); *Wolman v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977); *Hunt v. McNair,* 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973); *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971).

of whether one looks for a "direct and immediate effect" of advancing religion, a benefit to a "pervasively sectarian" institution, or the use of tax dollars to "teach" religion. Accordingly, the Court has no choice but to find that the Adolescent Family Life Act, on its face and as applied, has the effect of impermissibly advancing religion and thereby violates the First Amendment of the Constitution.

C. *Because Organizations Funded by the AFLA Have a Religious Character and Purpose, and the AFLA Programs Concentrate on Counseling and Education, the Degree of Government Monitoring Necessary to Prevent Grantees From Advancing Religion Would Necessarily Rise to the Level of Excessive Entanglement.*

Although the AFLA's primary effect of advancing religion renders it unconstitutional both on its face and as applied, the Court will also consider the statute's proclivity for fostering excessive entanglement between church and state. On that ground alone, the AFLA is unconstitutional on its face.

■■■■ To determine whether a statute fosters excessive entanglement, the Court must examine three factors: 1) the character and purpose of the institutions benefitted; 2) the nature of the aid; and 3) the nature of the relationship between the governmental and religious organization. *See Lemon v. Kurtzman*, 403 U.S. 602, 614–15, 622, 91 S.Ct. 2105, 2112, 2115, 29 L.Ed.2d 745 (1971). Each of these factors is *indicative*, but not dispositive, of the relationship between government and religion. *See Lemon*, 403 U.S. at 614–15, 622, 91 S.Ct. at 2112, 2115. Because the entanglement analysis looks at this relationship as a whole, no one factor is controlling. *See Tilton v. Richardson*, 403 U.S. 672, 688, 91 S.Ct. 2091, 2100, 29 L.Ed.2d 790 (1971). Thus, the Court will consider each of these factors in order to examine the AFLA's potential for excessive entanglement between government and religion.

Looking only at the AFLA's definition of "eligible grant recipient," which is a "public or nonprofit private organization or agency," 42 U.S.C. § 300z–1(a)(3), that sec-

tion of the AFLA, standing alone, does not seem to offend the Establishment Clause. Section 300z–5(a)(21)(B) of the AFLA, however, further defines what types of institutions the AFLA benefits by explicitly requiring applicants to describe how they will involve *"religious organizations"* in their programs. 42 U.S.C. § 300z–5(a)(21)(B) (emphasis added). Moreover, it is not disputed that a number of religious organizations are not only involved in AFLA programs but are grant recipients. *See supra* pp. 1562–67. Thus, the AFLA permits the involvement of religious organizations and has, in fact, involved such organizations. *See id.*

■■■■ The character and purpose of "religious organizations" is self-evident. The definition of "religious organizations" so clearly means organizations with a religious character and purpose that "one would necessarily need to consult a lawyer to effectively misconstrue it." *Logan v. United States*, 518 F.2d 143, 152 (6th Cir. 1975). Even if the Court were to go beyond the face of the statute and examine the organizations that have in fact received AFLA funding, the Court would have to conclude, as would be expected, that the "religious organizations" that have received AFLA funding have a religious character and purpose. *See supra* pp. 1562–67. Because these organizations have a religious character and purpose, the risk that AFLA funds will be used to transmit religious doctrine can be overcome only by government monitoring so continuous that it rises to the level of excessive entanglement. *See Lemon*, 403 U.S. at 615–16, 91 S.Ct. at 2112–13.

The AFLA provides monetary grants that are used largely for broadly described counseling-type services. *See* 42 U.S.C. § 300z–1(a)(4); *supra* p.1553. Such services "have a substantially different ideological character" from "secular, neutral, or nonideological services, facilities, or materials." *Lemon*, 403 U.S. at 616–17, 91 S.Ct. at 2113. The opportunity and potential for furthering religion by giving religious organizations money to provide counseling-related services is great, particularly

since this counseling involves teenagers. *Cf. Lemon*, 403 U.S. at 617, 91 S.Ct. at 2113. As the Supreme Court noted in *Lemon:*

> A textbook's content is ascertainable, but a [counselor's] handling of a subject is not. We cannot ignore the danger that a [counselor] under religious control and discipline poses to the separation of the religious from the purely secular. ... The conflict of the functions inheres in the situation.

403 U.S. at 617, 91 S.Ct. at 2113. Thus, considering the AFLA as a whole, the nature of the aid creates the danger that AFLA funds flowing to religious organizations will inescapably advance religion absent continual government monitoring, which the Establishment Clause forbids.

The final factor for the Court to consider in determining whether the AFLA fosters an excessive entanglement between government and religion is the nature of the relationship between the government and the AFLA-funded religious organization. *See Lemon*, 403 U.S. at 615, 91 S.Ct. at 2112. Because AFLA funds are used largely for counseling, to ensure that religion is not advanced would require extensive and continuous monitoring and direct oversight of every counseling session.

While extensive and continuous monitoring might prevent AFLA grantees from advancing religion, such monitoring would be impermissible in this case. *See Aguilar v. Felton*, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985); *Lemon*, 403 U.S. at 619, 91 S.Ct. at 2114. Wherever state-funded teaching by religious organizations is involved,

> a comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that ... the First Amendment ... is respected. Unlike a book, [however,] a [counselor] cannot be inspected once so as to determine the extent and intent of his or her personal beliefs and subjective acceptance of the limitations imposed by the First Amendment. These prophylatic contacts will involve excessive and enduring entanglement between state and church.

*E.g., Lemon*, 403 U.S. at 619, 91 S.Ct. at 2114; *Aguilar*, 473 U.S. at 410, 105 S.Ct. at 3237; *Meek v. Pittenger*, 421 U.S. 349, 352–53, 95 S.Ct. 1753, 1756–57, 44 L.Ed.2d 217 (1975); *Tilton*, 403 U.S. at 672, 91 S.Ct. at 2091; *Hunt v. McNair*, 413 U.S. 734, 746–49, 93 S.Ct. 2868, 2875–77, 37 L.Ed.2d 923 (1973).

By virtue of the foregoing, it is impossible to comprehend entanglement more extensive and continuous than that necessitated by the AFLA. Therefore, the Court can only conclude that such entanglement would be excessive.

In sum, a consideration of the institutions benefitted, the nature of the aid, and the nature of the relationship between government and AFLA-funded religious organizations forces the Court to conclude that the AFLA, on its face, fosters excessive entanglement between government and religion. The AFLA funds counseling-type services whose specific content may be determined by the religious organization itself. Counseling inherently involves teaching and, therefore, implicates the Court's concerns about the inability to segregate the religious from the secular without an impermissible entanglement between church and state. Indeed, because counseling is often done one-on-one, it is even more susceptible than teaching to the intentional or inadvertant advancement of religion. Although continual monitoring might make it appear that religion is not advanced, such monitoring would surely rise to the level of excessive entanglement between government and religion.

Moreover, AFLA grantees can be and are organized with express ties to religion. The religious character and purpose of the organizations funded makes them "a powerful vehicle for transmitting" religion. *Lemon*, 403 U.S. at 616, 91 S.Ct. at 2113. This potential for inculcating religious doctrine in the provision of counseling services is enhanced by the impressionable age of the adolescents to be helped by AFLA programs. *See id.* Therefore, the Court finds that the AFLA fosters excessive entanglement that is impermissible under the Constitution and is detrimental to government and religion.

D. *Because the AFLA Funds Religious Organizations to Provide Services Intrinsically Related to Fundamental Beliefs Upon Which Religions and Politicians Strongly Disagree, the AFLA Is Likely to Incite Political Division.*

 Although political divisiveness has never been the only ground for holding a statute unconstitutional, a statute that creates political division along religious lines is more likely to offend the Establishment Clause than one that does not. *See, e.g., Lynch,* 465 U.S. at 689, 104 S.Ct. at 1367 (O'Connor, J., concurring); *Meek,* 421 U.S. at 370–73, 95 S.Ct. at 1765–67; *Lemon,* 403 U.S. at 622–24, 91 S.Ct. at 2115–16; *Nyquist,* 413 U.S. at 796–99, 93 S.Ct. at 2977–78. The AFLA addresses very sensitive problems on which religions have important, even central, doctrines. For instance, the AFLA prohibits mention of abortion and encourages abstinence from premarital sex. The AFLA permits religious organizations to use government funds to provide care and counseling services related to these sensitive issues upon which religions' fundamental beliefs differ. *See supra* p. 1563. Such differences on fundamental beliefs tend to incite political division along religious lines. "[M]any people confronted with issues of this kind will find their votes aligned with their faith." *Lemon,* 403 U.S. at 622, 91 S.Ct. at 2115. Political division along religious lines was one of the evils against which the Establishment Clause was intended to protect. *Id.* Moreover, because AFLA funds are appropriated on an annual basis, the political fragmentation and divisiveness caused by the AFLA will be recurring and intensified. *See id.* at 623, 91 S.Ct. at 2116. Although the political division caused by the AFLA may not be sufficient to invalidate it, it is indicative of the problems caused when religion is involved in programs of this nature.

## VII. CONCLUSION

This Court is certain that the Adolescent Family Life Act emanates from well-founded and benign intentions. It is equally convinced that much of the AFLA has a laudable purpose. But the purposes of the statute are not the only issue before the Court. The critical issue is whether the AFLA, and the manner in which it is implemented by HHS, violates the Establishment Clause of the First Amendment.

 The Establishment Clause, in the words of Thomas Jefferson, erects a "wall of separation" between church and state. *See Everson v. Board of Education,* 330 U.S. 1, 16, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947). This wall exists not specifically to bar programs such as the AFLA but for a larger purpose: to protect the sanctity and freedom of all religions, regardless of their beliefs and practices. Although cooperation between government and religion to further mutually agreeable objectives may seem harmless, such cooperation may take on an intrusive and unwelcome color when conflicts arise between government directives and religious beliefs. History shows the necessity of protecting religion from government.

There will always be some who see no harm in utilizing the Executive branch to monitor religious organizations and some whose own religious beliefs are more likely than not to coincide with the beliefs given a governmental imprimatur. But there will always be others in our pluralistic society whose religious beliefs are out of harmony with the government-approved view and who may not be able to hold fast to their beliefs in the face of government involvement. For, as the Supreme Court noted, "when the power, prestige, and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." *Engel v. Vitale,* 370 U.S. 421, 431, 82 S.Ct. 1261, 1267, 8 L.Ed.2d 601 (1962). Equally plain, a society is only truly free when individuals are left free from direct or indirect pressure to abandon their own cherished religious beliefs for whatever set of beliefs currently holds government favor. As a result, it is essential that we scrupulously adhere to Jefferson's vision and protect religion from government intrusion, whether the intru-

sion is obviously malignant or seemingly benign.

Upon examination of the language of the Adolescent Family Life Act, the Court finds that on its face the AFLA has the primary effect of advancing religion and fosters excessive entanglement between government and religion. Moreover, the uncontroverted facts show, without a doubt, that as applied the AFLA has the primary effect of advancing religion. Accordingly, this Court has no choice but to find the AFLA unconstitutional on its face and as applied.

By virtue of the foregoing, the Court will issue an Order, of even date herewith, declaring that the Adolescent Family Life Act is unconstitutional both on its face and as applied, at least insofar as the statute involves "religious organizations" in AFLA programs. As a result of this determination, the Court will in that Order enjoin all funding of "religious organizations" under the AFLA. In light of the Court's decision, the Court has also ordered the parties to provide the Court with additional briefing and guidance as to whether, in light of *Alaska Airlines, Inc. v. Brock*, —— U.S. ——, 107 S.Ct. 1476, 94 L.Ed.2d —— (Mar. 25, 1987), the constitutionally infirm sections of the Act pertaining to "religious organizations" are severable from the Act as a whole. Upon receipt of those briefs, the Court will determine whether a hearing is necessary on the issue of severability and whether there are remaining issues relating to remedies for the Court to consider.

## ORDER

In accordance with the Opinion in the above-captioned case, issued of even date herewith, and for the reasons set forth therein, it is this 15th day of April, 1987,

ORDERED that plaintiffs' motion for a declaratory judgment that the Adolescent Family Life Act is unconstitutional on its face and as applied only insofar as religious organizations are involved in carrying out the programs and purposes of the Act, shall be, and hereby is, granted; and, it is

FURTHER ORDERED that plaintiffs' motion for an injunction prohibiting all funding be, and hereby is, granted only as it pertains to "religious organizations" under the Adolescent Family Life Act; and, it is

FURTHER ORDERED that defendant's and defendant-intervenors' motions shall be, and hereby are, denied consistent with this Order and the Opinion of even date herewith; and, it is

FURTHER ORDERED that the parties shall submit additional briefs addressing only whether the constitutionally infirm language pertaining to the use of "religious organizations" under the Adolescent Family Life Act is severable in light of *Alaska Airlines, Inv. v. Brock*, —— U.S. ——, 107 S.Ct. 1476, 94 L.Ed.2d —— (Mar. 25, 1987) and cases cited therein to the effect that absent a severability (separable) clause, apparently not present here, there is no presumption against severability, as well as the rule of law that

"[A] court should refrain from invalidating more of the statute than is necessary.... ['W]henever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act insofar as it is valid.'" *Regan v. Time, Inc.,* 468 U.S. 641, 652 [104 S.Ct. 3262, 3268, 82 L.Ed.2d 487] (1984) (plurality opinion), quoting *El Paso & Northeastern R. Co. v. Gutierrez,* 215 U.S. 87, 96 [30 S.Ct. 21, 24, 54 L.Ed. 106] (1909).

and the principle of law that

... " 'Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.'" *Buckley v. Valeo,* 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976) (*per curiam*), quoting *Champlin Refining Co. v. Corporation Comm'n of Oklahoma,* 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932). *Accord: Regan v. Time, Inc.,* 468 U.S., 641, at 653, 104 S.Ct. at 3268; *INS v. Chadha,* 462 U.S., 919, at

931–932, 103 S.Ct. at 2773–74; *United States v. Jackson,* 390 U.S. 570, 585, 88 S.Ct. 1209, 1218, 20 L.Ed.2d 138 (1968). *Id.* at —— U.S. at ——, 107 S.Ct. at 1480; and, it is

FURTHER ORDERED that any such briefs must be submitted to the Clerk of this Court within thirty business days of the date of this Order and any replies thereto shall be due within ten business days after such briefs are filed; and, it is

FURTHER ORDERED that, upon receipt of these briefs, the Clerk of the Court shall notify the parties if oral argument on the issue of severability is required.