Chan KENDRICK, Reverend Robert E.
Vaughn, Reverend Lawrence W. Bux-
ton, Dr. Emmett W. Cooke, Jr., Shirley
Pedler, Joyce Armstrong, John Roberts,
Reverend Homer A. Goddard, and the
American Jewish Congress, Plaintiffs,

v.

Dr. Louis SULLIVAN, Secretary of the
Department of Health and Human
Services, Defendant,

and

Sammie J. Bradley, et al., A Woman's
Choice, Inc., and Catholic Charities
USA, Defendants–Intervenors.

Civ. A. No. 83–3175 (CRR).

United States District Court,
District of Columbia.

July 9, 1991.

See also 125 F.R.D. 1.

Janet Benshoof, with whom Lisa Glick Zucker, Mary E. Wycoff, Catherine Albissa and Harry D. Snyder, American Civ. Liberties Union, New York City, Leslie Harris and Elizabeth Sarah Symonds, Washington, D.C., were on the brief, for plaintiffs.

Theodore C. Hirt, Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Thomas Millet, Charles W. Sorenson, Brook Hedge and Owen B. Cooper, Dept. of Justice, were on the brief, for defendant.

Kevin J. Hasson, with whom Diana L. Schacht and Peter W. Chatfield, Williams & Connolly, Washington, D.C., were on the brief, for defendant-intervenor A Woman's Choice, Inc.

J. Jerome Mansmann, with whom Manning J. O'Connor II, and Sandra L. Lannis, Mansmann Cindrich & Titus, Pittsburgh, Pa., and Marie N. Doland, Washington, D.C., were on the brief, for defendant-intervenor Catholic Charities USA.

Edward R. Grant, with whom George R. Grange II and H. Robert Showers, Washington, D.C., Clarke Forsythe, Leanne E.B. McCoy and Kevin J. Todd, Chicago, Ill., and Mari Anne T. Hamilton, Potomac, Md., were on the brief, for defendant-intervenor Sammie J. Bradley, Katherine K. Warner and United Families of America.

Phillip Hardin Harris and Mark E. Chopko, Washington, D.C., on the brief, for amicus curiae U.S. Catholic Conference.

CHARLES R. RICHEY, District Judge.

## I. INTRODUCTION

A diverse group including federal taxpayers, clergy, and the American Jewish Congress brought this suit on the grounds that the Adolescent Family Life Act ("AFLA"), on its face and as applied, violates the Establishment Clause of the First Amendment[1] by, *inter alia*, funding religious organizations to counsel adolescents on premarital sexual relations and pregnancy. This Court rendered an opinion finding that the AFLA violated the Establishment Clause both on its face and as applied. *Kendrick v. Bowen*, 657 F.Supp. 1547 (D.D.C.1987). In a 5–4 plurality opinion, the Supreme Court reversed this Court's holding that the AFLA was facially unconstitutional, and remanded the case for further consideration and development of the record on whether the AFLA is unconstitutional as applied. *Bowen v. Kendrick*, 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988) ("*Kendrick I*"). The Supreme Court directed that the as-applied inquiry should focus on (1) whether "AFLA aid is flowing to grantees that can be considered 'pervasively sectarian' religious institutions," and (2) "whether in particular cases AFLA aid has been used to fund 'specifically religious activit[ies] in an otherwise substantially secular setting.'" *Kendrick I*, 487 U.S. at 621, 108 S.Ct. at 2580 (quoting *Hunt v. McNair*, 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973)).

Now before the Court are cross-motions for summary judgment filed by the plaintiffs and the defendant-intervenor A Woman's Choice, Inc ("AWC"). The ferocity and magnitude of the battle over the critical facts distinguishes this action from other Establishment Clause cases, such as *National Coalition for Public Educ. and Religious Liberty v. Harris*[2] and *Felton v. Secretary, United States Dep't of Educ.*,[3]

---

1. The First Amendment to the Constitution of the United States provides in pertinent part: Congress shall make no law respecting an establishment of religion ...

2. 489 F.Supp. 1248, 1252–53 (S.D.N.Y.) ("*PEARL*"), *appeal dismissed,* 449 U.S. 808, 101 S.Ct. 55, 66 L.Ed.2d 11 (1980).

3. 739 F.2d 48 (2d Cir.1984) (using the same stipulated record as *PEARL*), *aff'd sub nom., Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985). *See also, e.g., Weisman v. Lee,* 728 F.Supp. 68, 69 n. 1 (D.R.I.1990) ("The

parties have filed an agreed statement of facts"), *aff'd* 908 F.2d 1090 (1st Cir.), *cert. granted,* —— U.S. ——, 111 S.Ct. 1305, 113 L.Ed.2d 240 (1991); *Aguillard v. Treen,* 634 F.Supp. 426 (E.D.La.1985), *aff'd Edwards v. Aguillard,* 482 U.S. 578, 596, 107 S.Ct. 2573, 2584, 96 L.Ed.2d 510 (1987) ("the District Court did not err in finding that appellants failed to raise a genuine issue of material fact, and in granting summary judgment"); *Americans United for Separation of Church and State v. School Dist. of Grand Rapids,* 546 F.Supp. 1071, 1077 (W.D.Mich.1982) ("the Court, after careful consideration of the

which proceeded on a stipulated record. Because the material facts are disputed by volumes of depositions, countervailing affidavits, declarations, and other evidence, the Court has been in the unenviable position of having to determine whether the factual disputes are material, and if so, whether this case must be set down for trial. *See* Fed.R.Civ.P. 56(c), (e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). After carefully considering the enormous record before it in light of the summary judgment standard, the Court finds that it has no choice but to conclude that this case can only be resolved by trial. Accordingly, by Order of even date herewith, the Court shall deny the cross-motions for summary judgment by the plaintiffs and AWC.[4]

## II. BACKGROUND

Congress passed the Adolescent Family Life Act, 42 U.S.C. § 300z *et seq.* (1982 & Supp.1991), to respond to the multiple and severe consequences associated with teenage pregnancy and premarital sexual relations.[5] 42 U.S.C. § 300z(a). The goal of the AFLA is to promote adoption and self-discipline, as well as to support comprehensive care services for pregnant adolescents and to encourage research into the societal causes and consequences of teenage pregnancy and sexual activity. § 300z(b). The Secretary of Health and Human Services administers the AFLA program through grants to public or nonprofit private organizations.

The AFLA creates three general program categories: care, prevention and research, §§ 300z–2 & 300z–7. The plaintiffs challenge the care and prevention services. The "care services" include pregnancy testing, maternity counseling, adoption and referral services, and primary and preventative health services. § 300z–1(a)(7). "Prevention services" are designed to "prevent adolescent sexual relations," and include counseling on matters such as pregnancy, sexuality, and family planning. § 300z–1(a)(8). Most of the care and prevention services involve some kind of counseling, teaching or referral services,[6] and

---

entire record, believes that the salient facts ... are largely undisputed"), *aff'd School Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985).

4. The Order accompanying this Opinion also disposes of two other pending motions in this case. As noted in the Order, the plaintiffs' Motion to Strike the defendant's January 26, 1990 memorandum is denied, and the plaintiffs' Motion to Strike the HSS' fact statements is denied.

5. The background and history of the AFLA has been well documented in the first phase of this litigation. *See Kendrick v. Bowen,* 657 F.Supp. at 1552–53, *rev'd and remanded,* 487 U.S. at 593–600, 108 S.Ct. at 2565–69.

6. Although the AFLA authorizes the Secretary of HHS to define the types of services a grantee must provide, *see* §§ 300z–1(a)(7) & (8), 300z–1(b), the statute lists "necessary services" that may be funded. Section 300z–1(a)(4) provides:

"(4) 'necessary services' means services which may be provided by grantees which are—

(A) pregnancy testing and maternity counseling;

(B) adoption counseling and referral services which present an adoption as an option for pregnant adolescents, including referral to li-

censed adoption agencies in the community if the eligible grant recipient is not a licensed adoption agency;

(C) primary and preventative health services including prenatal and postnatal care;

(D) nutrition information and counseling;

(E) referral for screening and treatment of venereal disease;

(F) referral to appropriate pediatric care;

(G) educational services relating to family life and problems associated with adolescent premarital sexual relations, including—

(i) information about adoption;

(ii) education on the responsibilities of sexuality and parenting;

(iii) the development of material to support the role of parents as the provider of sex education; and

(iv) assistance to parents, schools, youth agencies, and health providers to educate adolescents and preadolescents concerning self-discipline and responsibility in human sexuality;

(H) appropriate educational and vocational services and referral to such services;

(I) referral to licensed residential care or maternity home service; and

these services are targeted at adolescents. *See* § 300z(b)(3).[7]

Congress determined that governmental action alone would be insufficient to remedy the problems associated with teenage pregnancy and sexuality:

> [S]uch problems are best approached through a variety of integrated and essential services provided to adolescents and their families by other family members, religious and charitable organizations, voluntary associations, and other groups in the private sector as well as services provided by publicly sponsored initiatives.

§ 300z(a)(8)(B). Accordingly, the AFLA allows the funding of religious organizations to provide counseling, teaching and other services. The AFLA requires that applicants describe how they:

> will, as appropriate in the provision of services ... involve ... *religious* and charitable *organizations,* voluntary associations, and other groups in the private sector as well as services provided by publicly sponsored initiatives ...

§ 300z–5(a)(21) (emphasis added). Moreover, the AFLA restricts funding only to programs or projects which do not advocate, promote or encourage abortion. § 300z–10(a).

The plaintiffs argue that by providing government funds to religious organizations for counseling adolescents on matters intimately connected to religious beliefs, the AFLA as applied has the primary effect of advancing religion and fosters an excessive entanglement of government and religion, in violation of the Establishment Clause. The defendant and the defendant-intervenors argue that the Establishment Clause does not prohibit government funding of religious organizations to provide

the social services contemplated by the AFLA.

## III. THE STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides in pertinent part:

> The [summary] judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The movant bears the initial responsibility for informing the court of the basis for summary judgment, and must identify those portions of the pleadings, depositions, answers to interrogatories, admissions, and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. The Court must credit the non-movant's evidence and draw all justifiable inferences in its favor. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513–14. However, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252, 106 S.Ct. at 2512. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254, 106 S.Ct. at 2513. Finally, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ... ruling on a motion for summary judgment." *Id.* at 255, 106 S.Ct. at 2513.

---

(J) mental health services and referral to mental health services and to other appropriate physical health services;

(K) child care sufficient to enable the adolescent parent to continue education or to enter into employment;

(L) consumer education and homemaking;

(M) counseling for the immediate and extended family members of the eligible person;

(N) transportation;

(O) outreach services to families of adolescents to discourage sexual relations among unemancipated minors;

(P) family planning services; and

(Q) such other services consistent with the purposes of this subchapter as the Secretary may approve in accordance with regulations promulgated by the Secretary."

**7.** Section 300z–1(a)(9) defines "adolescent" as an individual under the age of nineteen.

These principles compel the Court to conclude that it cannot grant either motion for summary judgment, and that "the better course would be to proceed to a full trial." *Id.* at 255, 106 S.Ct. at 2513. After carefully examining the parties' statements of material fact not in dispute, the allegations of disputed facts and the entire record herein, the Court finds that numerous genuine issues of material fact are disputed, and therefore summary judgment is not appropriate as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex,* 477 U.S. at 322–24, 106 S.Ct. at 2552–53; *Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. at 2511; *Matsushita,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56. The following serves not to discuss the record exhaustively, but merely to illustrate why this case cannot be resolved on summary judgment.

## IV. GENUINE ISSUES OF MATERIAL FACT REMAIN AS TO WHETHER THE AFLA, AS APPLIED, HAS THE PRIMARY EFFECT OF ADVANCING RELIGION OR FOSTERS AN EXCESSIVE GOVERNMENT ENTANGLEMENT WITH RELIGION

### A. *Introduction*

■ As already established in this proceeding, to determine whether the AFLA violates the Establishment Clause, the Court must apply the three-part test set forth in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).[8] To be constitutional as applied under the *Lemon* test, the AFLA must 1) have a valid secular purpose, 2) not have the primary effect of advancing or inhibiting religion, and 3) not foster an excessive government entanglement with religion. *See Kendrick I,* 487 U.S. at 602, 108 S.Ct. at 2570–71. It

is settled that the AFLA has a valid secular purpose. *Id.* at 603–04, 108 S.Ct. at 2571–72. The Court must resolve two major questions to determine whether the AFLA has the primary effect of advancing religion: 1) whether AFLA is funding pervasively sectarian organizations and 2) whether AFLA is funding religious activity. *Id.* at 621, 108 S.Ct. at 2580–81. In addition, the Court must consider the parties' factual contentions regarding whether the AFLA promotes and endorses religion, or fosters excessive government entanglement with religion.[9]

### B. *Plaintiffs' Motion For Summary Judgment*

1. Genuine Issues of Material Fact Remain as to Whether AFLA Aid Is Flowing to Grantees that Are "Pervasively Sectarian"

The Supreme Court directed that "it will be open to appellees on remand to show that AFLA aid is flowing to grantees[10] that can be considered 'pervasively sectarian' religious institutions, such as we have held parochial schools to be." *Kendrick I,* 487 U.S. at 621, 108 S.Ct. at 2580 (citing *Hunt,* 413 U.S. at 743, 93 S.Ct. at 2874). Turning to that issue, the Court finds at this stage that the plaintiffs have not conclusively proved that a substantial number of AFLA grantees are pervasively sectarian.

■ While the meaning of the phrase "pervasively sectarian" is less than pellucid,[11] the Supreme Court has admonished that "it is not enough to show that the recipient of a challenged grant is affiliated with a religious institution or that it is 'religiously inspired,'" *Kendrick I,* 487

---

**8.** *See Kendrick I,* 487 U.S. at 602, 108 S.Ct. at 2570–71.

**9.** The Court will focus on "the manner in which the statute is presently being administered." *Kendrick I,* 487 U.S. at 621, 108 S.Ct. at 2580–81. However, the Court also finds relevant to the present proceeding the plaintiffs' showings in the first stage of this litigation. *See id.* at 620, 108 S.Ct. at 2580 ("there is no dispute that the record contains evidence of specific incidents of impermissible behavior").

**10.** The Court uses the word "grantee" to include both AFLA grantees and subgrantees.

**11.** *See e.g., Minnesota Federation of Teachers v. Nelson,* 740 F.Supp. 694, 708–14 & n. 3 (D.Minn. 1990) (analyzing the views of individual Justices and gleaning thirty-six factors considered by the Supreme Court in determining whether an educational institution is pervasively sectarian).

U.S. at 621, 108 S.Ct. at 2580. The Court must inquire whether a grantee's "secular purposes and religious mission are 'inextricably intertwined.'" *Id.* at 620 n. 16, 108 S.Ct. at 2580 n. 16. Factors which are relevant, but not conclusive, to the inquiry include whether the organizations have "explicit corporate ties to a particular religious faith and by-laws or policies that prohibit any deviation from religious doctrine." *Id.*

The plaintiffs' motion for summary judgment heavily depends on documentary evidence concerning various grantees' formal religious affiliation and motivations for providing AFLA services. Although this documentary evidence is relevant, much of it is contested or is insufficient to show that a grantee is an institution "in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission." *See Hunt,* 413 U.S. at 743, 93 S.Ct. at 2874. The plaintiffs concentrate their efforts on showing that a core group of fifteen AFLA grantees [12] are pervasively sectarian. First, the plaintiffs contend that numerous grantees, particularly the core group, have such an intimate affiliation with religious institutions or churches that they are pervasively sectarian. Many AFLA grantees have explicit corporate ties to religious institutions. Moreover, by-laws, mission statements, and other organizational documents indicate that grantees have religious missions. The plaintiffs contend that several grantees have policies which forbid any deviation from religious doctrine, or which admonish employees to abide by religious principles. A number of grantees require that religious leaders sit on their Boards of Directors, and often have Boards composed

largely of adherents to a particular faith. Other grantees reserve the right to discriminate on the basis of religion in hiring or the provision of services. Furthermore, some grantees recruit primarily through religious organizations.

The defendant [13] disputes most of the plaintiffs' contentions. While admitting that a number of grantees are religiously affiliated, the defendant argues that these grantees do not have a religious mission and do not conduct essentially religious activities.[14] *See Kendrick I,* 487 U.S. at 621, 108 S.Ct. at 2580 ("it is not enough to show that the recipient of a challenged grant is affiliated with a religious institution or that it is 'religiously inspired'"). The defendant argues that neither formal affiliation with a religion nor the adherence of grantees' staff to principles in their mission statements are sufficient to demonstrate that grantees are pervasively sectarian. In some instances, the defendant uses a provision in an organizational document to contradict a different part of the same document advanced by the plaintiffs. Moreover, the defendant argues that the religious motivations of grantees to provide social services cannot disqualify them from the AFLA program, and these religious motivations do not make the grantees instruments of religious indoctrination.

The defendant submitted a plethora of depositions and affidavits to dispute many of the plaintiffs' contentions. The defendant uses testimonial evidence to controvert plaintiffs' evidence that grantees have a religious mission or provide religious counseling or other services. The defendant also advances testimony explaining secular motivations for certain grantees'

---

12. These "core" grantees include: Catholic Family Services of Lynn, Massachusetts; Pregnancy Distress Center; A Woman's Choice, Inc.; Concho Valley Lifeline; Christian Family Care Agency; Catholic Social Services of Miami Valley; Educational Guidance Institute; Covenant House; Catholic Charities, USA; Pregnancy Services of Greater Lansing; Sisters of Charity Health Systems; Mercy Hospital; Catholic Charities of Fargo, North Dakota; Christian Community Conscious Center; and Pregnancy Helpline.

13. While the Court generally refers to HHS as "the defendant" in analyzing the opposition to the plaintiffs' motion for summary judgment, the Court also considers the submissions of the defendant-intervenors and amicus curiae. In referring to the various statements of fact and other submissions, the Court uses the parties' abbreviations.

14. *See, e.g.,* HHS Facts, CCUSA–Vol. M; CCUSA Opposition to Plaintiffs' Motion for Summary Judgment at 13–17.

actions, and uses some deposition testimony to controvert whether certain activities occurred or statements were made as plaintiffs allege. The volumes of conflicting testimonial evidence create genuine factual disputes and necessitate credibility determinations that should be made at trial.

A few examples involving representative grantees will illustrate the unresolved factual disputes between the parties. The plaintiffs have set forth numerous facts indicating that Concho Valley Lifeline's ("CVLL") secular purposes and religious mission were inextricably intertwined. CVLL was an AFLA grantee since 1987. FACTS II, CVLL–Vol. B ¶ 1. The preamble to CVLL's bylaws state that it was established "[f]or the purpose of promotion of the cause of the Christian Gospel and the extending of the Kingdom of Almighty God, to provide alternatives to abortion for women with stress pregnancies." *Id.* ¶ 3. CVLL's executive director testified that "the understood purpose" of CVLL was to "promote the Kingdom of Almighty God," *id.* ¶ 5,[15] and that she engaged in religious counseling in the crisis pregnancy center. *Id.* ¶ 7.[16] The plaintiffs also submit evidence that CVLL's Shepherding Home Program for pregnant teenagers required that clients be placed in Christian homes. *Id.* ¶ 4.

Moreover, at the time CVLL applied for AFLA aid, the eight member Board of Directors included two ministers, the Director of the children's church ministry at Our Savior's Church, an individual involved with the Ruth Sunday School Class, and another individual involved for seven years with the Angelo Christian School. *Id.* ¶¶ 11, 12. CVLL had a four member advisory board which included three ministers and the founder of the religious organization Alpha Omega College Ministries. *Id.* ¶ 13. CVLL's Advisory Committee for its AFLA project included the Director of a Baptist student union, the Director of a church youth group and a Catholic school teacher. *Id.* ¶ 35.

The defendant counters that plaintiffs' arguments not only are based on an inaccurate and misleading rendition of the facts, but also are erroneous because the challenged organization no longer exists. The defendant states that the original CVLL organization ceased operations in the spring of 1989 and was reorganized as Youth and Family Services, which does not promote religion or have any religious purposes. Moreover, the defendant argues that CVLL's Articles of Incorporation and the declaration and testimony of its founding board member demonstrate that the primary purpose of CVLL was to provide secular services for pregnant women. HHS Facts, CVLL–Vol. B ¶ 56. HHS further argues that the extent to which religious counseling or the distribution of religious materials occurred varied substantially depending on the volunteer involved and the interests of the client, and that there was no requirement for religious counseling. *Id.* ¶¶ 62, 64–66. HHS contends that while some members of CVLL may have been motivated by religious purposes or engaged in religious counseling, the organization as a whole cannot be considered pervasively sectarian.

The plaintiffs also allege that the Pregnancy Distress Center ("PDC") was at the time of its award a sectarian organization which promoted religion through its AFLA services. *See* FACTS II, PDC–Vol. L ¶ 7. According to the plaintiffs, PDC operated a crisis pregnancy center offering one-on-one counseling sessions in which counselors discussed religious beliefs with clients.[17] PDC also operated a Christian shepherding home service which required applicants to answer questions about their religion, how they felt about going to church, and how

---

**15.** Lindley Dep. at p. 26, FACTS II, CVLL–Vol. B, Apx. B, B00110.

**16.** CVLL's executive director further stated that religion arose in counseling sessions "as talking about life with the girl, the source of life, Jesus Christ." Lindley Dep. at p. 20, FACTS II, CVLL–Vol. B, Apx. B, B00104.

**17.** *Id.* ¶ 15. The defendant states that PDC counselors are permitted to talk about religion "if a client inquires first or asks first." HHS Res., PDC–Vol. L ¶ 15.

they felt about God.[18] The Board of Trustees of PDC included a minister and individuals who participated in religious training of volunteers. These Board members suggested clients pray about their pregnancy decisions. *Id.* ¶ 11. PDC recruited about forty percent of its volunteers from churches. *Id.* ¶ 14.

However, the defendant contends that PDC's Articles of Incorporation demonstrate that it began as a nonsectarian agency. The defendant concedes that PDC occasionally used religious references in its non-AFLA materials and counseling, but argues that all religious references have been excised and that the executive director returned the organization to its nonsectarian nature in 1988.[19] The defendant also contends that PDC's host home program does not have religious restrictions. HHS Res., PDC–Vol. L ¶¶ 11, 23.

The plaintiffs claim that the grantee Pregnancy Helpline ("PHL") is pervasively sectarian because it has financial and organizational ties with churches, and seeks to discuss religion with clients and distribute religious material to them. The project director has stated that PHL is "guided by Christian principles." FACTS II, PHL–Vol. H ¶ 4.

The defendant disputes these contentions. First, the PHL director testified that his statement "does not mean that we are a proselytizing organization." HHS Res., PHL–Vol. H ¶ 4. Second, the PHL staff handbook instructs staff to "[k]eep personal convictions (religious, political, prejudiced or social) to yourself." *Id.* ¶ 6. Third, the defendant submits testimony indicating that religious brochures were not distributed in PHL's AFLA project. *Id.* ¶¶ 6–9. Finally, the defendant contends that PHL has no formal religious affiliation

and has no clergy on the Board of Directors. *Id.* ¶¶ 3, 4, 12.

The plaintiffs also argue that five AFLA grants have been awarded to pervasively sectarian grantees [20] which are not sufficiently separate from their AFLA projects to avoid Establishment Clause problems. The plaintiffs contend that the AFLA projects at issue are at best physically separated from their other services, and that but for one AFLA project which has separately incorporated in February 1989, *see* FACTS II, PDC–Vol. L ¶ 2; HHS Res., PDC–Vol. L ¶ 2, these projects are not separated from the board, policies and general influence of the pervasively sectarian grantee. In addition, plaintiffs argue that three of the AFLA projects did not separate from their organization until after the initial funding determination was made by HHS. *See* HHS Res., PDC–Vol. L ¶¶ 1–2; HHS Res., AWC–Vol. D ¶ 25; HHS Res., CVLL–Vol. B ¶ 16. Plaintiffs argue that because HHS could not have known when it made its funding decision that these AFLA projects would be subsequently separated, the initial award of AFLA funds was improper, and similar violations will occur in the future. Plaintiffs conclude that these five organizations as a whole are pervasively sectarian, and that the mere physical separation of the AFLA projects from the rest of the organization has been insufficient to cure Establishment Clause violations.

The defendant denies that any of these organizations have a substantial religious mission, and alternatively argues that, in any event, the AFLA activities are sufficiently separate from the agencies' other activities to pass constitutional muster. The defendant states that there is virtually no contact between A Woman's Choice, Inc. and its AFLA project, HHS Facts, AWC–

---

**18.** *Id.* ¶ 23. The defendant contends that applicants for the host home program and families seeking to participate in the program are asked about their religious beliefs only to ensure that the client is placed in a compatible environment. HHS Res. PDC–Vol. L ¶ 23.

**19.** According to the current director of PDC, "our stand is non-sectarian and nondenominational." HHS Res., PDC–Vol. L ¶ 7.

**20.** These five grantees are A Woman's Choice, Inc.; Responsible Sexual Values Program, as successor to Pregnancy Distress Center; Pregnancy Helpline; Pregnancy Services of Greater Lansing; and Concho Valley Lifeline.

Vol. D ¶ 33, and notes that a prior AFLA grant to Pregnancy Distress Center now goes to Responsible Sexual Values Program, which became an independent corporation from PDC in February 1989. HHS Res., PDC and RSVP–Vol. L ¶¶ 2, 4. HHS also states that Pregnancy Helpline's AFLA program is distinct from Pregnancy Problem Center, which provides abortion counseling. HHS Res., PHL–Vol. H ¶ 5. In addition, HHS states that the AFLA project of Pregnancy Services of Greater Lansing has "generally operated separately" from its non-AFLA services and "usually has not involved volunteers from the crisis pregnancy center." Def. Opp. at 41; HHS Facts, PSGL–Vol. G ¶¶ 25–38. Finally, the defendant argues that when the original Concho Valley Lifeline organization operated a crisis pregnancy center, there was virtually no actual involvement of the CVLL Board, staff or volunteers in the operation of the AFLA prevention project. *See* HHS Facts, CVLL–Vol. B ¶¶ 58–59, 67–70, 73, 78–80.

2. Genuine Issues of Material Fact Remain as to Whether AFLA Aid Has Been Used to Fund Religious Activity

The plaintiffs · also have argued that HHS' administration of AFLA has allowed federal monies to fund "specifically religious activities." *Kendrick I*, 487 U.S. at 621, 108 S.Ct. at 2580. The plaintiffs have marshaled evidence indicating that HHS has funded projects which have used their AFLA funds to develop, use, and distribute religious materials, and to provide religious counseling or teaching. However, as will be illustrated in the following discussion, the defendant produces volumes of deposition transcripts, affidavits, and other documentary evidence to dispute the plaintiffs' major contentions. Thus, genuine issues of material fact remain which preclude summary judgment.

The plaintiffs contend that certain AFLA grantees have engaged in religious counsel-

ing and teaching. For example, a Catholic Charities USA social worker stated that "she, as a Catholic social worker, did not like being told that she could not mention God in her work," and that "if the client's situation was very difficult, [she] told her to pray." FACTS II, CCUSA–Vol. M ¶ 107. The defendant submits testimony and other evidence that AFLA programs have not tried to proselytize or inculcate religious doctrine, but instead have strived to provide professional, secular counseling. In another instance, the parties dispute whether Catholic Social Services of Miami Valley imposes Catholicism in its AFLA adoption services.[21] The parties also dispute whether Our Lady of Providence Children's Center, the Clark Street House of Mercy project, and Catholic Charities USA have promoted religion in counseling. *See* FACTS II, CSS–MV–Vol. N ¶¶ 30–32; HHS Res., CSS–MV–Vol. N ¶¶ 30–31; FACTS II, Children's Center–Vol. R ¶ 27; HHS Res., Children's Center–Vol. R ¶ 27; FACTS II, Misc.–Vol. U ¶ 6; HHS Res., Vol. U ¶ 6; FACTS II, CCUSA–Vol. M ¶ 107; HHS Res., CCUSA–Vol. M ¶ 107.

The plaintiffs further argue that certain grantees developed religious materials and disseminated them to project staff and volunteers as well as clients. The defendant counters that many of the quotations plaintiffs take from AFLA materials are distorted and misleading, and that minor references to religion or religious values do not rise to Constitutional significance. HHS contends that none of the curricula which it has approved promotes religion. In addition, the defendant flatly disputes whether some of the grantees' materials were ever used. For instance, plaintiffs allege that Pregnancy Helpline used several materials with religious messages. HHS states that it informed PHL before awarding the AFLA grant that the use of some materials was impermissible, and they were not used. HHS Res., PHL–Vol. H ¶¶ 32, 63, 28. HHS also contends that other materials were

---

**21.** The plaintiffs contend that Catholic Family Services of the Miami Valley requests that clients indicate their preference for the religious affiliation of the adoptive family to promote religion, FACTS II, CSS–MV–Vol. N ¶¶ 1, 28, while the defendants submit evidence that the program requests this information to comply with Ohio law. HSS Facts, CSS–MV–Vol. N ¶ 5.

never used in connection with the AFLA project. *Id.* ¶¶ 29, 30.

Moreover, the defendant provides testimony that some ostensibly religious materials were not used to promote religion. The plaintiffs contend that Christian Community Consciousness Center ("CCCC") used a religious filmstrip, *Springtime of Your Life,* as well as a religious brochure, *Practical Reasons for Chastity.* FACTS II, CCCC–Vol. F ¶ 39, 42–43. The defendant disputes that the brochure was ever used and contends that the filmstrip does not teach or promote religion. HHS Res., CCCC–Vol. F ¶¶ 39, 42. The plaintiffs also allege that Pregnancy Services of Greater Lansing proposed using religious materials in its AFLA project, but the defendant challenges that assertion. HHS Res., Vol. G ¶¶ 17, 25; HHS Facts, Vol. G ¶¶ 27a–28.

The plaintiffs further allege that some grantees regularly referred clients to religious organizations. Some grantees recruited volunteers mainly through churches. The plaintiffs argue that many grants only have served to expand already existing religious programs. The defendant disputes the accuracy and significance of these allegations and denies that certain incidents or activities occurred as the plaintiffs allege. Finally, the defendant argues that the totality of grantee activities, not merely isolated incidents, reveals that the AFLA program has been administered in compliance with the Establishment Clause. HHS alleges that in rare instances in which

a grantee has misunderstood or disregarded HHS' grant conditions and guidance, HHS has adequately addressed the problem.[22]

3. Genuine Issues of Material Fact Remain as to Whether the AFLA, as Administered, Fosters an Excessive Government Entanglement with Religion

The plaintiffs argue that HHS' review and monitoring procedures have been consistently inadequate. The plaintiffs contend that HHS has often fallen short of its goals by approving religious materials, or failing to monitor and prevent the use of religious materials. In addition, plaintiffs contend that HHS failed to monitor the religiosity of grantees, and even when aware that a project was intimately connected with a religious grantee, failed to increase its monitoring. Furthermore, the plaintiffs contend that HHS funds grantees without knowing what services will be offered as part of the AFLA project, inadequately instructs grantees about compliance with AFLA, and improperly revises its review forms to remove suggestions of problems in grantees' programs. The plaintiffs argue that, in some areas, the current AFLA program does too little to prevent Establishment Clause violations, and in other areas creates an excessive government entanglement with religion.

HHS contends that its administration[23] of the AFLA program has clearly been

---

**22.** The plaintiffs also argue that HHS' administration of AFLA creates a substantial risk of promoting religion. Moreover, the plaintiffs contend that the AFLA program constitutes an endorsement of religion because AFLA presentations are given on religious sites, amidst religious symbols, and grantees target religious audiences and hold themselves out as religious organizations, all of which creates the public perception that AFLA programs are religious. HHS disputes a number of the plaintiffs' specific contentions, argues there is nothing improper about the inconspicuous presence of religious symbols at some presentation sites, and notes that HHS has issued specific guidance for grantee announcements for AFLA presentations. Without reaching the merits of these contentions, the Court notes that numerous genuine issues of material fact remain, and these argu-

ments can only be settled after the full development of a record at trial.

**23.** The AFLA lacks an express statutory prohibition against the use of funds for religious purposes. Moreover, HHS has not promulgated regulations specifically prohibiting the use of AFLA funds to promote religion. Instead, HHS imposes 12 grant conditions for each AFLA grant. Grant Condition No. 7, which is particularly relevant to this case, states, "The grantee will not teach or promote religion in the AFL Title XX program. The program shall be designed so as to be, to the extent possible, accessible to the public generally." In addition, after *Kendrick I,* HHS developed a Guidance for AFLA grantees. The Fall 1988 Guidance contains 13 hypothetical questions and answers designed to assist grantees in complying with Grant Condition No. 7. The HHS Office of

adequate, and has improved steadily since its inception.[24] HHS argues that grantee materials appropriately have been reviewed. HHS also asserts that while some grantees have given AFLA presentations without final approval, these were merely technical violations of the grant requirements. HHS maintains that there has been insufficient use of religious materials to pose Constitutional problems. HHS acknowledges that it takes a long time to review and approve curricula, but argues the delay is a function of a thorough review process. Def. Opp. at 107. Furthermore, the defendant contends that it has issued appropriate guidance to prevent Establishment Clause problems, and when HHS has discovered violations of grant conditions, it has taken appropriate remedial action. Finally, the defendant disputes the plaintiffs' characterizations of many facts. Def. Opp. at 109 n. 157. Because numerous factual disputes remain unresolved, at this stage the Court will not rule on whether the AFLA as applied fosters excessive entanglement between government and religion.

### C. *Motion For Summary Judgment By A Woman's Choice, Inc.*

■ The Court now turns to the motion for summary judgment filed by A Woman's Choice, Inc. AWC seeks a declaration that neither HHS' AFLA grant to AWC nor HHS' other grants and procedures violate the Establishment Clause. However, because there are genuine issues of material fact, the Court at this stage declines to enter judgment in favor of AWC. Because the Court has already illustrated that genuine issues of material fact remain as to whether the other AFLA grants violate the Establishment Clause, the Court will address why summary judgment is inappropriate for AWC in particular.

AWC maintains two offices. The office in Falls Church, Virginia, operates AWC's AFLA project, "Teen Choice." Teen Choice is an abstinence project. AWC also operates a non-AFLA project, a crisis pregnancy center. AWC argues that neither AWC as a whole nor its AFLA project is pervasively sectarian, and that Teen Choice uses a curriculum that is secular, does not engage in religious activities, and does not promote religion.

The plaintiffs counter that AWC is pervasively sectarian, and argue that the mere physical separation of Teen Choice from AWC does not cure the AWC's AFLA grant of Constitutional infirmity. AWC distributes religious literature,[25] and its articles of incorporation state that its purposes are "to restore solid Judeo–Christian principles" and "to teach and promote Judeo–Christian values." [26] AWC's personnel policies indicate that all employees of AWC are expected to agree with the organiza-

---

Adolescent Pregnancy Programs ("OAPP") monitors AFLA grantees and reviews their applications. OAPP project officers supervise specific grants and monitor grantees through, *inter alia,* phone communications, site visits, and reviews of reports, grant applications and grant renewals.

**24.** Yet if the AFLA program has improved, it may be because the plaintiffs have been serving as private attorney generals or as qui tam plaintiffs.

**25.** Plaintiffs note that materials for AWC's clients include *37 Ways to Say No,* which states: "Commit each date to the Lord; be Christlike, and act like Jesus would if He were on a date." FACTS II, AWC–Vol. D ¶ 3. The pamphlet entitled *The Questions Most People Ask About Abortion* states, "You need to realize that since you assisted in that abortion, you are a partaker in that sin.... Since you now see the wickedness

of this, you need to immediately go to the Lord, and with your whole heart ask Him to forgive you." *Id.* Another document entitled *The Bible and Abortion* states that "only God has final rights to any person's body" and quotes the Bible for the position that "[s]ince the Bible regards the fetus as personality, then the aborting of the fetus is murdering personality." *Id.*

AWC admits that religious literature is available to clients at its crisis pregnancy center, but states that most AWC clients do not receive religious literature. *See* Response of A Woman's Choice to Plaintiffs' Statement of Material Facts at 5.

**26.** *See* Memorandum in Support of Motion of A Woman's Choice, Inc. for Summary Judgment ("AWC MSJ") at 1–2. HHS Res. AWC–Vol. D ¶ 11, Counter–Statement of Facts ¶ 11. AWC offers testimony of its chairman of the board that the terms mean "the basic family values of Western Culture." AWC MSJ, Exh. 3 at 38–39.

tion's basic principles. FACTS II, AWC–Vol. D ¶ 11.

The plaintiffs argue that both of AWC's AFLA and non-AFLA projects are linked, and that several individuals who have worked at the pregnancy center work for Teen Choice. Moreover, the plaintiffs contend that the majority of Teen Choice's volunteers are recruited through church bulletins and nearly all volunteers are recruited through church contacts. FACTS II, AWC–Vol. D ¶ 65. Furthermore, many AFLA volunteers list religious reasons for volunteering and/or have served as religious school teachers or counselors.

Teen Choice gives classroom presentations in public high schools and junior high schools on the advantages of sexual abstinence. The plaintiffs argue that Teen Choice uses a curriculum that promotes religion. Teen Choice developed a four chapter curriculum which included a chapter entitled, "Reasonable Reasons to Wait." FACTS II, AWC–Vol. D ¶ 40. The plaintiffs claim that a booklet included in the "Reasonable Reasons to Wait" curriculum, which is distributed to students, mixes AWC's secular counseling on sexual abstinence with a religious message:

> If I say, 'I don't believe in intercourse before marriage because my religion tells me so,' without thinking through why my religion tells me so, or whether I feel any respect for myself or my partner, then I am out of control of my values.

*Id.* ¶ 43. The plaintiffs also complain that *Reasonable Reasons to Wait* contains religious references, instructs presenters to distribute religious materials, and contains a bibliography referring to religious materials. *Id.* ¶¶ 41, 43–44, 52. For example, in presentations to Public Junior High Schools, AWC personnel lecture from the *Sex Respect* curriculum. During their AFLA presentations of both *Sex Respect* and *Reasonable Reasons to Wait* in Fairfax County, AWC staff use the religious terms "spirituality" and "spiritual development" in their discussion of human sexuality and sexual maturity. *See, e.g., id.* ¶ 41.[27] The plaintiffs conclude that AWC has used its AFLA funds for religious activity and that AWC's religious affiliation creates a substantial risk of advancing religion, endorses religion, and results in an excessive government entanglement with religion.

Though admitting many of the plaintiffs' factual allegations, AWC disputes the legal significance of these facts. The primary factual dispute is the extent to which AWC and Teen Choice have been, or currently are, inextricably linked. At the summary judgment stage, the Court cannot overlook the plaintiffs' evidence—which is more than a mere scintilla and which must be construed in their favor—tending to prove that AWC's AFLA grant poses Establishment Clause problems. Although AWC's argument may prove successful at trial, the evidence on the issue of whether the AFLA grant to AWC violates the Establishment Clause presents genuine issues of material fact. Accordingly, the Court shall deny the motion for summary judgment by A Woman's Choice.

## V. REMEDY

At this juncture, it would be premature for the Court to rule on the issue of remedy. The parties have debated the appropriateness of several potential remedies, ranging from, *inter alia,* striking down the statute as applied to religious organizations, enjoining the administration of the AFLA program,[28] requiring HHS to issue

---

**27.** AWC submitted an affidavit from the director of Teen Choice stating that Teen Choice uses the word "spiritual" only at the request of Fairfax Public schools. *See* Opposition of A Woman's Choice, Inc. to Plaintiffs' Motion for Summary Judgment at 7, Exh. 5 ¶ 9.

**28.** *See Kendrick I,* 487 U.S. at 623, 108 S.Ct. at 2581–82 (O'Connor, J., concurring) ("appellees may yet prevail on remand"); *id.* at 653, 108 S.Ct. at 2597 (Blackmun, J., dissenting) ("the

District Court … may well decide, as I would today, that the AFLA as a whole has been unconstitutionally applied"); *id.* at 628 n. 2, 108 S.Ct. at 2583 n. 2 ("[T]he manner in which the [plaintiffs'] challenge is characterized does not limit the relief available. Where justified by the nature of the controversy and the evidence in the record, a federal district court may invoke broad equitable powers to prevent continued unconstitutional activity") (citing *Hutto v. Fin-*

appropriate regulations, or striking down impermissible grants on an individual basis.[29] Without ruling on the merits of these remedial theories, the Court recognizes that it may have to exercise its broad remedial power after the trial record is developed. Ultimately, the Court's determination of the appropriate relief in this case will depend on the nature and scope of the violations which are proved at trial. *See Kendrick I*, 487 U.S. at 623–24, 108 S.Ct. at 2581–82 (O'Connor, J., concurring) ("If the District Court finds on remand that grants are being made in violation of the Establishment Clause, an appropriate remedy would take into account the history of the program's administration as well as the extent of any continuing constitutional violations").

## VI. CONCLUSION

After carefully considering the applicable law, the arguments of counsel for all parties, the memoranda of law and the entire record herein, the Court concludes that there remain in this case numerous genuine issues of material fact that may only be resolved through a trial. The Court will issue an Order of even date herewith in accordance with this Opinion.

## ORDER

The defendant has filed a Motion to Strike portions of Plaintiffs' Statement of Material Facts and Supporting Appendices. In short, the defendant argues that a large portion of the documents and statements relied on by the plaintiffs to support their Motion for Summary Judgment must be stricken for failure to meet the requirements of Fed.R.Civ.P. 56(e). The defendant contends that the plaintiffs: (1) failed to authenticate documents; (2) relied on hearsay; and (3) submitted numerous facts and supporting material which are not relevant to the present inquiry.

After carefully considering the defendant's motion, the supporting and opposing memoranda, the arguments of counsel, and the entire record herein, the Court shall deny, without prejudice, the defendant's motion as to most of the challenged documents and statements.[1] Of the approximately 1800 documents which plaintiffs have submitted in support of their motion for summary judgment, all but about 50 were produced from the defendant's own files, or the files of AFLA grantees and can be properly considered on the pending cross-motions for summary judgment. Approximately 1750 documents are both authentic and admissible as government documents, business records, admissions, and other inherently reliable and competent evidence. In addition, many of the documents fall within exceptions to the hearsay rule. Other documents have been submitted not for the truth of the matter asserted, but to show that the statements had been made, and thus do not fall within the scope of hearsay. Furthermore, documents which the defendant generally challenges on the basis of relevancy involve grantees' religious views, which are relevant to the pending motions for summary judgment at this stage of the case.

Fed.R.Civ.P. 56(c) and (e) are not overly restrictive and are not the only means of presenting evidence on a summary judgment motion. Any material that would be admissible or usable at trial may be considered by the Court. 10A C. Wright and A. Miller, *Federal Practice and Procedure* § 2721 at 40 (and cases cited therein).

ley, 437 U.S. 678, 687, & n. 9, 98 S.Ct. 2565, 2572, & n. 9, 57 L.Ed.2d 522 (1978); *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275–76, 28 L.Ed.2d 554 (1971)).

**29.** *See Kendrick I*, 487 U.S. at 622, 108 S.Ct. at 2581 ("Should the Court conclude that the Secretary has wrongfully approved certain AFLA grants, an appropriate remedy would require the Secretary to withdraw such approval").

**1.** The defendant's overly broad attack disregards the mandate of Fed.R.Civ.P. 7(b)(1). The defendant's memorandum in support of the Motion to Strike contains a number of broad arguments and an appendix which identifies documents by number and simply lists each document under one of three headings: hearsay, authentication, or relevance. Thus, the Court is compelled to respond to the Motion to Strike in general terms.

The plaintiffs have persuasively shown that documents which the defendant has challenged as unauthenticated meet either the minimal requirements of Fed.R.Evid. 901 or are self-authenticating under Fed.R. Evid. 902. Most of these documents either meet the general requirement of Fed.R. Evid. 901(a), or are public records under Fed.R.Evid. 901(b)(7), are authentic under Fed.R.Evid. 901(b)(4), are self-authenticating under Fed.R.Evid. 902, or have been authenticated by affidavit.

Moreover, as to the defendant's general hearsay objections, documents are admissible under the various hearsay exceptions or are nonhearsay. The documents are relevant, reliable and essential to a just and proper adjudication of this matter.[2] The documents have a significant indicia of reliability, because the vast majority were produced from the Department of Health and Human Services and the AFLA grantees, and the defendants rely on, and respond to the same types of documents in their opposition to plaintiffs' motion for summary judgment. In addition, the potential prejudice to the defendant is low. Furthermore, the danger posed by hearsay is diminished in this case because the Court is the trier of fact. *See* 4 *Weinstein's Evidence,* ¶ 800[03] at 800–17 (1987) (and cases cited therein).

Much of the documentary evidence challenged as hearsay is admissible under Fed. R.Evid. 803(24) as having circumstantial guarantees of trustworthiness;[3] as public records under Fed.R.Evid. 803(8);[4] or as records of regularly conducted activity under Fed.R.Evid. 803(6)[5]. In addition, a number of documents obtained from the defendant or the defendant-intervenors A Woman's Choice, Inc. or Catholic Charities, U.S.A. are also admissible as non-hearsay

admissions by party-opponents under Fed. R.Evid. 801(d)(2) or as non-hearsay statements under Fed.R.Evid. 801(c) because they are not being offered for the truth of the matter asserted.

Finally, the defendant challenges on relevancy grounds some documents regarding the religious views of various AFLA grantees on the issues of adoption and abortion. The Court rejects the defendant's argument and finds that this evidence meets the threshold for relevancy.

Given the enormous scope and generality of the defendant's motion, and considering the general reliability of the challenged documents, the timing of the case, the breadth of the record, and given that the surrounding circumstances are such that alternative avenues of presenting the evidence are infeasible and impractical, the Court shall generally deny the defendant's motion. As to the remaining some 50 documents which the plaintiffs produced from remaining sources, the Court shall reserve its ruling until the time of trial.[6] There may be an admissibility problem with respect to these documents, but in light of this Order and the Court's Opinion disposing of the cross-motions for summary judgment, the parties may be able to resolve their evidentiary disputes, or the plaintiffs may develop alternative theories for their admissibility.

Accordingly, it is, by the Court, this 9th day of July, 1991,

ORDERED that defendant's Motion to Strike portions of the Plaintiffs' Statement of Material Facts and Supporting Appendices shall be, and hereby is, denied as to the approximately 1750 documents produced by the defendant and various AFLA grantees; said denial is without prejudice

---

2. The Court's decision is influenced by the magnitude and complexity of this case, the limited feasibility of alternative sources of information, and the limited resources of the parties.

3. *See, e.g., United States v. American Tel. and Tel. Co.,* 516 F.Supp. 1237, 12439–41 (D.D.C. 1981).

4. *See, e.g., Ellis v. International Playtex, Inc.,* 745 F.2d 292 (4th Cir.1984).

5. *See, e.g., United States v. Johnson,* 722 F.2d 407 (8th Cir.1983); *United States v. Ullrich,* 580 F.2d 765, 771–72 (5th Cir.1978).

6. The Court has determined that questions as to the admissibility of these some 50 documents would not affect the Court's ruling on the motions for summary judgment filed by the plaintiffs and A Woman's Choice, Inc.

to the defendant renewing objections at the time of trial; and it is

FURTHER ORDERED that as to the approximately 50 documents produced to the plaintiffs from sources other than the defendant or AFLA grantees, the Court shall reserve its ruling until the time of trial.